## Staunton.

## SHANKLE V. SPAHR.

### September 20, 1917.

1. GIFTS—*Causa Mortis—Policy of the Law.*—The rules of law on the subject of gifts *causa mortis* are well settled. If such a gift falls within those rules, it is the duty of the courts to sustain it, but, for reasons of public policy, such rules should not be extended or relaxed.

2 GIFTS—*Executory Gifts.*—Only executed parol gifts, whether *inter vivos* or *causa mortis,* are valid. Such gifts, if executory, being without consideration to support them, are invalid.

3. GIFTS—*Causa Mortis—Delivery of Possession.*—Delivery of possession of the subject of the gift by the donor, in his lifetime, is essential to the execution of a gift *causa mortis.*

4. GIFTS—*Causa Mortis—Delivery of Possession—Case at Bar—Constructive Delivery.*—The subject of the alleged gift in the instant case was gold coin—tangible personal property. It was not too ponderous for manual delivery and hence such delivery could not be dispensed with under the rule established by the decisions applicable to personal property of that character. There was no delivery of the means of getting possession and enjoyment of the thing, hence there was no constructive delivery in the instant case. The information given by the donor to the donee of the secret place of hiding of the gold does not come within the rule established by the decisions defining what amounts to constructive delivery. To constitute constructive delivery, it is essential that there should be a physical delivery of some tangible object which may serve as the means of getting possession and enjoyment of the subject of the gift.

5. GIFTS—*Words of Present Gift.*—All gifts, whether *inter vivos* or *causa mortis,* are gifts *in praesenti.* There must be words of *present* gift as well as delivery. The one without the other is insufficient. Though there be actual delivery, yet if the words of gift accompanying the delivery indicate an intention on the part of the donor not to confer on the donee the power

of taking physical possession of the thing *until the donor's death*, then the proceeding is an abortive testamentary act and not a gift.

6. GIFTS—*Delivery—Acquiescence in Possession.*—In gifts *inter vivos* acquiescence of a donor, after words of donation, in a previously acquired possession of the donee, has been held to be sufficient evidence from which to imply a delivery of the possession by the donor to the donee as such; but this relaxation of the rule with respect to delivery of possession in cases of gifts *inter vivos* has never been extended to gifts *causa mortis* in Virginia, nor, by the great weight of authority, elsewhere.

Error to a judgment of the Circuit Court of Washington county, in an action of trover. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

In this action of trespass on the case in trover and conversion the plaintiff in error was the plaintiff and the defendant in error was the defendant in the court below, hereinafter referred to as plaintiff and defendant.

The evidence in the case was as follows:

The plaintiff to maintain the issue on his part testified as a witness for himself, as follows:

"That he was the executor of the estate of Mary J. Steele, deceased, under her will dated February 28, 1911, codicil to the will dated May 26, 1914; that Mary J. Steele was an old lady and a widow living by herself, except that her maiden sister, Nancy Spahr, lived in the house with her. That she lived on a farm in the lower end of Washington county, about three or four miles from his farm and that occasionally he attended to Mrs. Steele's business, such as taking her money to Bristol for deposit in the band. That in February, 1915, he went to Mrs. Steele's house to get some money that had been paid her the day before and he said to her in the presence of Cordie Ringley, a white girl hired by Mrs. Steele to wait upon her and do her cooking, 'Aunt

Mary, why don't you deposit your gold in the bank? The bank will pay back to you money in gold if you ever want it.' Cordie Ringley spoke up and said, 'Why, I didn't know there was any gold here,' to which he replied, 'Yes, Aunt Mary has got $450.00 in gold.' Mrs. Steele then spoke up and said, 'No, Shankle, you are wrong. I have got $350.00 in gold.' And turning to Cordie she said, 'Go and look between the chimneys and bring that coffee pot in here. *The gold is wrapped up in a flannel rag and is in the pot.'* Cordie went out and came back with two coffee pots and turned them up and one of them was empty and the other had in it only a flannel rag. Mrs. Steele seemed to be very much worried that the gold was not there and he said to her, 'Don't worry about that, Aunt Mary, I expect some one has taken the gold for safe keeping and you will find it, but if you don't you have got enough to live on any way,' and Cordie seemed to be worried also because she was afraid that she might be accused of taking the gold. The next time he went back to Mrs. Steele's house, which was within a week or so afterwards, Cordie told him that Mrs. Ritta F. Spahr had gotten the gold. Mrs. Steele died in August following the occurrence mentioned above. The witness was then asked this question: 'After the death of Mrs. Steele, did you make demand on Ritta F. Spahr for the gold?' Answer, 'I did.' 'Did Mrs. Spahr refuse to give you the gold?' Answer, 'She did.' On being recalled to the stand witness said that in a conversation with Mrs. Steele years before her death she had told him about having this gold and said that she wanted it to go to the Steele heirs and after the occurrence referred to above as having taken place in February, 1915, she again told him in the presence of Cordie Ringley that she wanted that gold to go to the Steele heirs."

And further to maintain the issue on his part, the plaintiff introduced Miss Cordie Ringley, who testified as follows:

"That she was hired by Mrs. Steele to wait on her and cook for her in January, 1915, after Mrs. Steele had received a stroke of paralysis. That on the 22nd day of February, Mr. W. K. Shankle came to the house and got some money that Mrs. Steele had received the day before that to deposit it in the bank and that he said to her, 'Why don't you let me deposit your gold?' and that she, Cordie, spoke up and said, 'I did not know that there was any gold in the house?' and Mr. Shankle said, 'Yes, Aunt Mary has got $450.00 in gold,' and that Mrs. Steele said, 'No, Shankle, I have only got $350.00 in gold,' and she then told me to go out and bring in a coffee pot that I would find between the chimneys which I did. I found two coffee pots and brought them both in and emptied their contents on the floor, one of them being empty and the other had nothing in it but an old flannel rag. Mr. Shankle then said to Mrs. Steele not to worry that probably some one had taken the gold for safe keeping. I was very much worried because I was afraid I would be accused of having taken the gold. The next morning when Mrs. Ritta F. Spahr came over to the house I said to her, 'Someone has taken Aunt Mary's gold,' and she said to me, 'Well don't worry about that, I have got the gold,' and afterwards she told me that Mrs. Steele had given her the gold but that she was not to take it away until she saw the end was near."

These were the only witnesses called for the plaintiff.

## DEFENDANT'S TESTIMONY.

To maintain the issue on her part the defendant, over the objection of the plaintiff, was sworn as a witness and testified as follows:

76

"That she was the niece by marriage, of Mrs. Mary Steele, and that she had stayed with Mrs. Steele for quite a number of years when she (Mrs. Spahr) was a young girl; that Mrs. Steele had lived with her husband in Illinois a number of years after their marriage and that she had returned to this country some twenty-five years ago, and that since that time, she (Mrs. Spahr), has looked after Mrs. Steele when she was ill, and waited upon her, and that she was with her a good deal of the time; that her relation to Mrs. Steele was very much like that of a daughter. That up to Mrs. Steele's illness, during late years, she has been with her more, than prior to that time; that Mrs. Steele lived in one end of a double log house, and Nancy Spahr, Mrs. Steele's sister, lived in the other end; that Mrs. Steele was about eighty years old when she died, and Nancy Spahr about 90, at the present time. That there was a chimney between these double houses, and that on one side of the house there was a door to this opening, next to the chimney, and it was used to store sweet potatoes in. That in October, 1914, she and Mrs. Steele were at this potato hole about the time sweet potatoes were put away, and that Mrs. Steele told her to climb up and see if 'that coffee pot there is heavy.' Mrs. Spahr then climbed up within reach of a certain shelf where the coffee pot was, that was pointed out by Mrs. Steele, and took it down, saying, 'Yes, it is heavy.' Mrs. Steele then said, 'Ritta, when you see the end approaching, and that I am passing away, I want you to take this coffee pot for you will have to look after Nancy when I am gone, and you will need the gold.'

"Mrs. Spahr then set the coffee pot back on the shelf, and nothing more was said about it, nor did she examine its contents until some time in February following, when she was called to the bedside of her aunt, Mary Steele; that Mrs. Steele had had a stroke of paralysis and that she was seriously ill at the time and that some time during that

night, while she (Mrs. Spahr), was at the bed of Mrs. Steele, Mrs. Steele looked up at her and said, 'I am passing away, go get it,' at the same time waiving her * * * and pointing to the chimney and that part of the house where the coffee pot was located.

"That a very short time after this she (Mrs. Spahr) went to the potato hole, got the coffee pot and took it into the other part of the house where Aunt Nancy lived, and where Zeb Spahr, Ritta Spahr's son, lived with her Aunt Nancy, and there gave it to Zeb Spahr, where he, together with herself, took the coffee pot to his room, and that he there counted the gold and found it to be $220.00, and he thereupon put it in his bureau drawer and locked it up."

"That a few days after she and her son Zeb Spahr, took the coffee pot down to her home and there put it in Zeb Spahr's trunk, which was the only place she had to lock it up, and that a short time after this Isaac Spahr, another son of Mrs. Ritta Spahr, who had been attending school at King College, returned home and brought with him his trunk, which she thought had a better lock on it than Zeb Spahr's trunk, and that the suggestion was made that the coffee pot and its contents be put in Isaac Spahr's trunk, and that thereupon it was removed from Zeb Spahr's trunk and Isaac Spahr and Zeb Spahr and Mrs. Spahr herself, counted the gold and found it to be $220.00. Then it was put in Isaac Spahr's trunk and locked up.

"That after Mrs. Ritta Spahr and her son Zeb had taken the gold home, she went to see her Aunt Mary Steele one afternoon and while there Mrs. Steele asked her 'Ritta, what became of the coffee pot.' Mrs. Ritta Spahr replied 'It is safe. I took it home with me.' Mrs. Steele then said 'That is all right' and Mrs. Spahr said to Mrs. Steele 'What if King Shankle asks about it.' Mrs. Steele replied, 'Tell Shankle it is none of his business.' "

(The defendant produced the coffee pot and exhibited the same before the jury, showing just how the gold was wrapped in flannel, just as it was when she first saw it. Showing that it was wrapped in tissue paper, then in a small piece of flannel around which was wrapped a still larger piece, and then it was laid between two other larger pieces of flannel, in the coffee pot, and the whole amount thus exhibited was $220.00).

Mrs. Ritta Spahr stated further "that Mrs. Steele left her a tract of land under her will, and also left some bequests to her children, and that her (Mrs. Spahr's) home was only a very short distance from Mrs. Steele's home, and that Mrs. Steele was always called upon when she was in trouble, or needed attention. That Aunt Nancy is very feeble now and I am living in the house with her and waiting upon her, and caring for her the best that I know how. She had some land, I don't know exactly how much. I think about forty acres.' Mrs. Spahr further testified that Mrs. Steele never after this time recovered from this illness but that she continued to be very weak from the time she told Mrs. Spahr to 'go and get' the gold, continuously until her death, about the 20th of August, 1915. That she did, at that time, have a stroke of paralysis and this continued until the time of her death and that nothing was ever said after her conversation with Mrs. Steele subsequent to the visit of King Shankle, about the gold, and that Mrs. Steele had to have assistance when she wanted to move in her bed, during this time."

There was a trial by jury and verdict for the defendant, which the plaintiff moved the court to set aside, because contrary to the law and the evidence; and for other reasons covered by the assignments of error. This motion was overruled and the judgment complained of was entered in accordance with said verdict.

Considering the evidence under the rule applicable thereto in this court, we find the following to be the material facts upon the question which, in the view we take of it, is decisive of the case.

## THE FACTS.

The words of donation were the following: "Ritta, when you see the end approaching and I am passing away, I want you to take this coffee pot for you will have to look after Nancy when I am gone and you will need the gold." There were no subsequent words of donation.

In accordance with the words of donation, possession of the subject of the gift was not to be delivered to the donee until the donor was *in articulo mortis*—that is to say, such possession was not to be delivered in the lifetime of the donor but at her death, and at a time when it was not to be expected that the donor could be physically capable of herself delivering such possession, hence the donee was to then *take* such possession. Accordingly, the delivery of possession of the subject of the gift relied on by the defendant occurred as follows: When the donor thought her death was at hand, she looked up to the donee and said: "'I am passing away, go get it,' at the same time waiving her * * *," (supposedly her arm or hand) "and pointing to the chimney and that part of the house where the coffee pot was located." This was all the donor did towards delivering the possession aforesaid. It was not completed by the donor. The donee subsequently completed the tradition of such possession by taking the possession. There is no evidence that the donor was then conscious of what was occurring; on the contrary, the evidence for the defendant shows that she was not. The possession of the subject of the gift, therefore, was not delivered by the donor, but taken by the donee.

It later developed that the donor was not *in articulo mortis*, as she supposed at the time she directed the donee to take said possession, so that in fact the latter obtained the possession before she was entitled to it in accordance with the words of donation. On being informed of such possession, the donor acquiesced in it thereafter for some six months, until her death in fact occurred; but she uttered no further words of donation, and during this time the donee had no right to the possession of the subject of the gift save for safekeeping, and did not become the donee of it until the donor did in fact arrive at the end of her life. That is to say, the fact in the instant case is, that the title of the defendant to the subject of the gift rests upon the words of donation aforesaid, not perfected by any delivery of possession thereof made by the donor in her lifetime.

*S. V. Fulkerson* and *N. P. Oglesby*, for the plaintiff in error.

*Jno. W. Price* and *Frank W. DeFriece*, for the defendant in error.

SIMS, J., (after making the foregoing statement) delivered the opinion of the court.

In the view we take of the case it will be necessary for us to decide only one question raised by the assignments of error, namely:

1. Was there such delivery of possession of the subject of the gift in the instant case as to make a valid gift *causa mortis?*

The rules of law on the subject of gifts *causa mortis* are now well settled by the authorities. If such a gift falls within those rules, it is the duty of the courts to sustain it,

but, for reasons of public policy which have been too often stated to need restatement here, such rules should not be extended or relaxed.

Only executed parol gifts, whether *inter vivos* or *causa mortis*, are valid. Such gifts, if executory, being without consideration to support them, are invalid.

Delivery of possession of the subject of the gift by the donor, in his lifetime, is essential to the execution of a gift *causa mortis*.

As said by Judge Baldwin in delivering his opinion in the case of *Miller* v. *Jeffries*, 4 Gratt. (45 Va.) 472: "A *donatio mortis causa* is of a mixed character, being partly testamentary and partly donative from an indulgence to the nature of the emergency the law dispenses with the solemnities of a testament; and for that very reason requires the essentials of a gift. A delivery is indispensable to the validity of a *donatio mortis causa*. It must be an actual delivery of the thing itself, as of a watch or ring, or of the means of getting possession and enjoyment of the thing, as of the key of a trunk, or of a warehouse where the subject of the gift is deposited; or, if the thing be in action, of the instrument by using which the chose is to be reduced into possession, as a bond, or. a receipt or the like. \* \* \*

"It is not the possession of the donee, but the delivery to him by the donor, which is material in a *donatio mortis causa;* the delivery stands in the place of nuncupation, and must accompany and form a part of the gift; an after-acquired possession of the donee is nothing; and a previous and continuing possession, though by the authority of the donor, is no better."

See also, to same effect, and also as bearing on the propositions of law hereinafter stated, the learned and able article of Prof. Graves on the subject of "Gifts of Personalty," 1 Va. Law Reg. 871, *et seq; Ward* v. *Turner*, 2 Ves. Sr. 431, 1 Lead. Cas. in Eq., p. 1205 and note; *Seabright* v.

*Seabright,* 28 W. Va. 471; *Ewing* v. *Ewing,* 2 Leigh (29 Va.) 343, *Hatch* v. *Atkinson,* 56 Me. 324, 96 Am. Dec. 464; *Gano* v. *Fisk,* 43 Ohio St. 462, 3 N. E. 532, 54 Am. Rep. 819; 2 Gratt. Va. Rep. Ann., note on "Gifts," bottom pp. 393, 400; *Thomas* v. *Lewis,* 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848; *Cutting* v. *Gilman,* 41 N. H. 147; *Bunn* v. *Markham,* 7 Taunt. 224; note to *Spratley* v. *Wilson,* 1 Holt 10, at pp. 12 and 13; *McCord's Adm'r* v. *McCord,* 77 Mo. 166, 46 Am. Rep. 9; *Case* v. *Dennison,* 9 R. I. 88, 11 Am. Rep. 222; *Basket* v. *Hassel,* 107 U. S. 610, 2 Sup. Ct. 415, 27 L. Ed. 500.

The subject of the alleged gift in the instant case was gold coin—tangible personal property. It was not too ponderous for manual delivery and hence such delivery could not be dispensed with under the rule established by the decisions applicable to personal property of that character. There was no delivery of the means of getting possession and enjoyment of the thing, hence there was no constructive delivery in the instant case. The information given by the donor to the donee of the secret place of hiding of the gold does not come within the rule established by the decisions defining what amounts to constructive delivery. To constitute constructive delivery it is essential that there should be a physical delivery of some tangible object which may serve as the means of getting possession and enjoyment of the subject of the gift.

Therefore, the delivery of possession relied on by the defendant in the instant case, to be valid, must have been an actual delivery of possession of the subject of the gift to the donee by the donor in her lifetime.

As we have seen from the statement of facts above, the alleged donor did not herself complete the act of making such delivery of possession in her lifetime. Moreover, as stated by Judge Burks in his learned and able brief in the case of *Thomas* v. *Lewis, supra* (which by general consent

has come to have the force of authority on this subject) "All gifts, whether *inter vivos* or *causa mortis*, are gifts *in praesenti*. There must be words of *present* gift as well as delivery. The one without the other is insufficient. Though there be actual delivery, yet if the words of gift accompanying the delivery indicate an intention on the part of the donor not to confer on the donee the power of taking physical possession of the thing *until the donor's death*, then the proceeding is an abortive testamentary act and not a gift. *Basket* v. *Hassel*, 107 U. S. 602, 2 Sup. Ct. 415, 27 L. Ed. 500, is an illustration and authority in point."

The case of *Basket* v. *Hassel* sustains this position, certainly with respect to gifts *causa mortis*.

As we have seen from the above statement of facts, in the instant case, the words of donation—"the words of gift"—expressed the intention on the part of the alleged donor not to confer on the alleged donee the power of taking physical possession of the thing until the donor's death. The proceeding was, therefore, "an abortive testamentary act and not a gift."

The acquiescence of the alleged donor in the instant case in the possession of the defendant, acquired by authority of the former, it is true, but under a mistake as to the time of donation having arrived, without other words of donation giving the donee the power to take physical possession of the thing *as donee*, until the donor's death, was but an acquiescence in a possession acquired previous to the time fixed therefor by the words of gift, and was, in principle, "a previous and continuing possession * * * by the authority of the donor," which, as firmly established by the authorities, is insufficient to validate a gift *causa mortis*.

It is true that in gifts *inter vivos* acquiescence of a donor, after words of donation, in a previously acquired possession of the donee, has been held to be sufficient evidence from which to imply a delivery of the possession by the

donor to the donee as such; but this relaxation of the rule with respect to delivery of possession in cases of *gift inter vivos* has never been extended to gifts *causa mortis* in Virginia, nor, by the great weight of authority, elsewhere. In this particular, and in some others not necessary to refer to here, the rule, stated generally, that the same delivery of possession of the subject of the gift which suffices to validate gifts *inter vivos* will suffice to validate gifts *causa mortis*, is subject to qualification. In the instant case, however, there was no possession of the subject of the gift acquired before the words of donation, and none acquired after such words in accordance therewith.

The proof in the instant case amply ·establishes the intent of the alleged donor to make the gift, and we wish to say of the foregoing conclusions, as was said by Lewis, P., in the case of *Yancy* v. *Field*, 85 Va., at p. 758, 8 S. E. at p. 721: They have "been reached not without reluctance. Had we the authority to execute the alleged gift, or, in other words, to give effect to the manifest intention of the decedent to aid" (the defendant), "the court would without hesitation affirm" (the judgment). "But we have no such authority. Our province is not to make law, but to administer it, and we must, therefore, decide this case according to the settled law as it is written, and not permit a hard case to make bad law."

For the foregoing reasons, we are constrained to the opinion that there was error in the action of the trial court and judgment complained of, and hence such judgment must be set aside and annulled and a new trial granted, to be had, if the plaintiff is so advised, not in conflict with this opinion.

*Reversed.*