JAMES Q. FARMER, Administrator,

vs.

MARY A. FARMER et al.

*Transaction with Decedent—Competency of Witness—Undue Influence—Action by Administrator—Enforcement of Trust—Substitution of Parties.*

Under Code, Art. 35, Sec. 3, in an action by an administrator against two relatives of his decedent to have transferred to the former a certain savings bank deposit made by such decedent in her own name and that of one of such relatives, and made payable to the survivor of them, it being alleged that the making of the deposit in that form was procured by undue influence exerted by such relative upon a person lacking in mental capacity; and also to procure an accounting by such relative and her sister as to monies belonging to said decedent alleged to be in their hands, neither the administrator nor either of the said relatives is competent to testify to any transaction with or statement by decedent.                                    p. 72

On an issue as to whether a certain bank deposit made by decedent to the order of herself and a niece, and in terms payable to the survivor, was caused to be made in that form by the niece's exertion of undue influence upon decedent, while of impaired mental capacity, *held* that, even if the relations between such niece and decedent were such as to impose upon the former the burden of showing decedent's understanding of the transaction and an absence of undue influence on the niece's part, the burden was sufficiently met.                                    p. 83

In a proceeding by an administrator to set aside a transfer of a bank account made by decedent to herself and another and to the survivor of them, the administrator cannot assert that such other, having acquired the fund as having survived decedent, holds it in trust for certain nephews and nieces, of whom plaintiff is one.                                    pp. 86, 87

A bill filed by an administrator to set aside a transfer by his decedent cannot be amended by making certain persons, including plaintiff in his individual capacity, parties plaintiff, for the purpose of asserting a trust in favor of such persons as regards such fund, since there would then be entirely new parties plaintiff.　　　　　　　　　　　　　　　　　　　p. 87

*Decided September 9th, 1920.*

Appeal from the Circuit Court of Baltimore City (GORTER, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*N. Charles Burke* and *Edward H. Burke,* for the appellant; the brief having been prepared by the late *S. S. Field.*

*Harry M. Benzinger* and *Isaac Lobe Straus,* for the appellees.

BOYD, C. J., delivered the opinion of the court.

This case is before us on an appeal from a decree which dismissed an amended bill of complaint filed by James Q. Farmer, administrator of Bridget Quinn, against Mary A. Farmer and Margaret M. Farmer, who were nieces of Bridget Quinn, and the Metropolitan Savings Bank of Baltimore. The theory of the bill is that a deposit by Bridget Quinn in that bank, on August 1, 1912, of the sum of $82,966.45, in the name of "Bridget Quinn, in trust for herself and Mary A. Farmer, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor," was the result of improper influences and dominion exerted over her Aunt Bridget by Mary A. Farmer, and that Bridget did not understand the effect of such entry. Between August

1, 1912, and July 9, 1917, when Bridget died, other deposits were made in that account and interest added, so that there was the sum of $106,933.68 in it at the time of her death. The bill also alleges that there had been paid by the trustees under the will of Patrick M. Quinn to Bridget Quinn and Margaret M. Quinn, her sister, between June 1, 1910, when the present trustees were appointed, and the death of Bridget Quinn, the sum of $25,083.47, of which only the sum of $12,444.87 was deposited, leaving $12,638.60 to be accounted for, and of that amount the sum of $5,972.82 had been paid to Bridget between her last deposit in bank and her death, which was unaccounted for. The object of the bill was to have the amount in bank at the time of her death transferred to, or paid over to the appellant, and to require Mary A. and Margaret M. Farmer to account for the $12,638.60.

.Patrick M. Quinn died in 1886, leaving a will by which, after providing for some legacies, he left his entire estate to Patrick J. Farmer, his nephew, in trust for the benefit of the testator's three sisters, Sarah Craig, widow, Margaret Quinn and Bridget Quinn, during their lives and the lives of the survivors and survivor, with remainder to the six children of another sister, Ann Farmer, who had pre-deceased him. Sarah Craig died January 4, 1891, Margaret Quinn died December 15, 1910, and Bridget Quinn, as we have seen above, July 9, 1917. Patrick J. Farmer, the trustee named in the will, died May 7, 1910, and on June 1, 1910, James Q. Farmer and Mary A. Farmer were appointed trustees in his place. They paid to Margaret and Bridget Quinn the net income from the estate of Patrick M. Quinn until the death of Margaret, and after that to Bridget Quinn. Margaret and Bridget had several accounts in banks in their joint names with provisions similar in form to the one of Bridget and Mary A. Farmer mentioned above, and they resulted in the balance going to Bridget, upon the death of Margaret. The great bulk, if not all, of the money of Bridget came from the estate of her brother Patrick and from

what Margaret had received from that estate, together with interest on the deposits.

Four of the six children of Ann Farmer died before Bridget Quinn. James F. died in 1888, leaving surviving him a widow and four children (the plaintiff being one of them), Bernard J. died in 1894, John F. in 1898, and Patrick J. on May 7, 1910, none of them leaving descendants, excepting James F. The defendants, Mary A. and Margaret M. Farmer, are the other children of Ann Farmer. They received the estates of their deceased brothers, John F. and Patrick J. Farmer, and they and the four children of James F. were, at the time of her death, the next of kin of Bridget Quinn, there being no other relatives of her of equal degree of relationship. The estate of Patrick M. Quinn, after the payment of legacies, was valued at about $75,000.00.

Exceptions were filed by the plaintiff to certain of the testimony of Mary A. and Margaret M. Farmer and to some other evidence, and the defendants excepted to certain evidence of the plaintiff. It cannot be doubted that Mary A., Margaret M., and James Q. Farmer were incompetent to testify to any transactions with or statements made by Bridget Quinn under the terms of the statute (Sec. 3 of Art. 35 of the Code), and the decisions of this Court construing that statute are too numerous to require the citation of many of them, but that of *Martin* v. *Munroe,* 121 Md. 679, shows that what transpired at a bank, in reference to a deposit made in the name of a deceased party, comes within the prohibition of the statute, although a party to the cause is not made incompetent to testify at all, but only as stated above. Some of the testimony of these parties is therefore not to be excluded on account of the provisions of the statute, but other portions are, and they are material parts. As the record is a very large one, we will not attempt to quote the testimony at length, but will content ourselves for the most part with giving the substance of it on the several points involved.

The briefs to a great extent ignore the exceptions to testimony which were filed as to the competency of the witnesses

named, and discuss the facts as if there were no such excep-
tions, although there can be no doubt that much of it is inad-
missible. We will confine ourselves to such facts as we deem
material and are supported by competent evidence, or are
admitted, keeping in mind that the witnesses mentioned are
not made incompetent to testify at all, but are only pro-
hibited from testifying to statements by and transactions with
Bridget Quinn. The record shows that for many years the
Quinns lived together at the corner of Madison and Stirling
Streets in the City of Baltimore until the death of Patrick
M. Quinn in 1886, Mrs. Craig in 1891 and Margaret Quinn
in December, 1910. The evening of the day Margaret was
buried, Bridget Quinn went to live with her nieces, Mary A.
and Margaret M. Farmer, at their home on the corner of
Aisquith and Madison Streets, a short distance from her
former home, and continued to live with them until her
death. During all of that time, Mary A. and James Q.
Farmer were trustees under the will of Patrick M. Quinn,
and all of the income which Bridget had was derived from
what she received from those trustees and the interest on the
money she had in bank. There had been an account in the
Commonwealth Bank in the name of Margaret Quinn in
trust for herself and Bridget Quinn, joint owners, etc., the
balance of which ($16,735.91), Bridget drew out October
7, 1910, and deposited in the Metropolitan Savings Bank,
and on February 9, 1911, she drew out the balance of an
account in the Metropolitan Bank ($16,103.81), which stood
in the name of Margaret Quinn, in trust for herself and
Bridget, etc., and deposited that in her own account, that
being after Margaret's death. She also had an account in
the Marine Bank, the balance of which ($28,348.07) she
drew out on August 1, 1912, and deposited in the Metropol-
itan Bank. Those three items were included in her account
which she had entered in trust for herself and Mary A.
Farmer. On January 30, 1895, an account was opened at
the Metropolitan Bank in the name of Bridget, in trust for

herself and sister Margaret, in which $6,000 was entered on that day, and that was the beginning of the account which was finally transferred on August 1, 1912. On the same day, January 30, 1895, an account was entered in that bank in the name of Margaret, in trust for herself and sister Bridget, which was opened with a deposit of $6,001.12, and the balance in that account was the one transferred to Bridget's account on February 9, 1911.

There is no valid evidence in the case tending to show that Bridget ever said or did anything during the period of nearly five years between the time the account was entered to the joint use of herself and Mary A. Farmer and her death, that she had not so entered the account, or that she did not understand that at her death it would pass to Mary A. Farmer, unless it can be said that it may be inferred from the evidence of Mrs. James F. Farmer and Mary B. Farmer, who said that she told them over and over again that she was saving her money for Mary A., Margaret M., and the children of James F. The appellant contends that that shows that she did not understand that she had so entered her account in bank as to pass it to Mary A., or the effect of such an entry. But if we give full effect to the evidence of Mrs. Farmer and Mary B. Farmer, the conclusion contended for by the appellant does not necessarily follow. There is nothing in the record to suggest that Bridget did not have full confidence in her niece, Mary A. Farmer, at least during the time she lived with Mary A. and Margaret M. Indeed, the contention of the appellant is that she was under her influence and dominion. If she did have full confidence in her, as she apparently had, the entry of the account in the joint names was not unnatural, or necessarily unjust, or at all surprising under the circumstances. Patrick M. Quinn, the founder of this fortune, provided for his sisters first, the income of his estate going to the three while living, then to the survivors after the death of one, and to the survivor when only one was left, and then the remainder to the children of

his deceased sister Ann Farmer. When Bridget and Margaret Quinn became the survivors, they had their bank accounts so entered that, upon the death of either, the balance went to the survivor. Neither of them then provided for their nieces, Mary A. and Margaret M. Farmer, in the entries in bank, nor for any of the children of their nephew, James F. Farmer. Upon the death of either Margaret or Bridget Quinn, their nieces, the defendants, would have had no legal right to the balance in bank, owing to the form in which they were entered. As Bridget was the survivor, she received the balances and, although they were the nieces of Margaret and Bridget, Mary A. and Margaret M. Farmer got nothing by the death of Margaret Quinn, and would have received nothing from those accounts, if Margaret had survived. Was it wrong or unjust in thus leaving out Mary A. and Margaret M. Farmer? Margaret and Bridget Quinn had the right to do as they pleased with their money, and if there had been an attempt by Mary A. and Margaret M. Farmer to have the entries in bank declared invalid when Margaret Quinn died, it would have been next to impossible to have succeeded, although when Margaret Quinn died, in December, 1910, they and Bridget Quinn were her only next of kin, as at that time grandnephews and grandnieces were not entitled to participate in the distribution of a personal estate, if there were nephews and nieces living. It was not until April 4, 1912, that the statute giving grandnephews and grandnieces the right to stand in the place of their deceased ancestors was passed.

As Margaret and Bridget Quinn thus left out their two nieces, it would, on the face of such entries in bank, seem to have been as unjust and inequitable in their doing so, as it was for Bridget to leave out the children of James F. Farmer. But it is altogether probable that Bridget was satisfied to trust her niece, Mary A., to take care of her sister, Margaret M. Farmer, and she may have had in mind also her grandnephews and grandnieces. The testimony of Mary A. was

that as she and her aunt were going from the Marine Bank to the Metropolitan Bank on August 1, 1912, her aunt said to her, "Mary, I am going to have your name put in my bank book in the same manner my sister Margaret's is put in, because if anything should happen to me it would save trouble," and she said, "Well, Aunt B., there is my sister Mag—I meant my sister Margaret." She said, "It is just the same. As long as you are with me, let it go at that." Margaret M. Farmer corroborated her sister in saying that after they got back to the house, her aunt told her what she had done, and she told her aunt that was all right. The plaintiff excepted to that and other evidence which Mary A. gave as to what transpired at and on the way to the bank, and then claimed that the defendants had not sufficiently proven that Bridget thoroughly understood the effect of the transfer. As we have already said, that evidence was incompetent and must be stricken out, although in another phase of the case it might have helped the plaintiff more than the defendants, as will be seen later, but as the account was entered to the joint use of Mary A. and Margaret M. a few days after Bridget's death, Margaret has no reason to complain, and is not complaining. It is just what might well have been done. The evidence shows that Mary A. always went to the bank with Bridget after she went to live with her nieces, that Mary was with her the day she entered her account in the Metropolitan Bank to the use of herself and Mary, and it may well be assumed that she entered it as she did because she believed that Mary would provide for and take care of her sister, just as she (Bridget) had done for her sister, and she may have expected and understood that her niece would provide for her grandnephews and grandnieces. It is the sort of confidence which an aunt might have in her nieces, but not such as must lead a court to the conclusion that it was the result of undue influence.

When Margaret Quinn died, it was perfectly natural that Bridget would want to live with her nieces, who were her

nearest relatives. There is no evidence that she did not want
to live with them, or even that they urged her to do so, and
it was not only proper for her to go to them, but it would
not have been wise for one of her age to live alone. It is
established by the evidence that Bridget Quinn, although in
the neighborhood of eighty years of age when she went to
live with her nieces, was a woman of remarkably good health.
Mary B. Farmer, sister of the plaintiff, testified that she
was of large physique, and that she did not know of her hav-
ing any ailments excepting some bronchial trouble on one
occasion, and occasionally she would complain of indigestion.
All of the witnesses who testified on that subject agreed as
to her physical condition. Dr. Wilmer Brinton said he had
been her physician for 36 years, and that he was called to
see her about 2 A. M., July 9, 1917, when she was very
ill, was then semi-conscious; that he saw her at 10 o'clock
at night on July 3rd, after she had fallen downstairs and
had a contusion of the face and arm from the fall; that he
saw her July 3rd, 4th and 6th and dismissed her at that
time; that he had attended her in October or November,
1915, for bronchitis, when she was under his care for about
three weeks, and he saw her every day during the twenty-one
days she was under his care. He was asked: "At that time,
tell his Honor what were the state and qualities of her
mind?" And replied: "Perfect, sir; as far as I could see
by comparison with my previous acquaintance with her."
Then there is in his testimony the following: "Q. How would
you characterize, for the court's information, her mentality
with regard to the powers of her mind and the powers of her
will? A. I think extraordinary good for a woman advanced
in life, extraordinary good, a woman of good common sense.
She always impressed me as being a woman of average men-
tal condition, even when she was very much younger than
she was then. I saw her in November, 1915. Q. Did you
ever observe any weakness of mind or will in her? A. None
at all, never did." On further examination, he said: "Of

course, my visits to her were purely professional, and when I saw her in November of 1915. I did not see her again until July, 1917; these two occurrences in July, and then was called to see her in her last illness. I was much impressed when I saw her after an interval of a year and a half, that there had been no marked change, although she had fallen and hurt herself. Although she had fallen and hurt herself badly, she talked to me as she did on many occasions. My calls were quite infrequent to her, a year and a half from the time she had bronchitis until the time of the injury." Then there appears in his evidence the following: "Q. Was she in any condition of childish dependency when you saw her? A. Not to my knowledge. That would be my professional opinion expressed now of her condition then. Q. And her condition had not changed from the time you knew her as a young woman? A. No, sir; I saw no material change at all in her case. Q. Would you say she was capable of attending to her business transactions and of making a contract and executing a deed? A. I am not in a position to say that. I do not know that, sir. I do not know. I mean to say this, I do not know, I could not say that she was in a condition to make a contract. I could not say, except I think she was mentally in a very good condition. Q. Did you see anything about her to indicate that she could not make a valid deed or contract or to attend to business? A. No, I did not."

We do not understand that Dr. Brinton meant to express any doubt about her mental condition, even then, which was several years after the deposit was made, but he simply showed a caution in answering such questions, which unfortunately experts do not always manifest. Father Ennis testified that he first knew her in 1912, and from that time called to see her about once a month except when there was sickness, and he then went oftener. He described her as heavily built, "and as far as her mental qualities went, a woman of good, strong will, determination of character and

of sincerest honesty," and that "her mental powers were perfectly clear and defined and direct." He said he did not observe any change in her mental powers up to the time of her death, although physically she got weaker, he thought from rheumatism, and about a month before her death, he administered Holy Communion to her at the house, and she was then, "perfectly clear, and just as determined as I had known her in the beginning and all through the successive visits." A number of witnesses testified to the effect that she was a woman of rather decided character and, although some of them expressed opinions as to her mental condition, which were not admissible because sufficient foundation had not been laid for giving opinions, there is no evidence to show the contrary, and unquestionably the weight of the evidence tended to show that she was a woman of remarkable physical strength and of good common sense. According to Doctor Brinton, her sister Margaret had a brighter mind than she had, but nothing in the record would justify the conclusion that she was incapable of doing what she did, in having entered in the bank the account to the use of herself and Mary A. Farmer, or in connection with the other bank accounts. The testimony of the plaintiff's witnesses about her dwelling on being left as a surviving member of her family and grieving over her sister's death does not show any lack of mental power, but it would have been very remarkable if she had not felt as she did on that subject. A great deal of testimony on both sides is of but little importance, but we do not find any that would justify the court in holding that Bridget was not competent to do what she did, or that she did not understand what she was doing, or that it was the result of undue influence over her. The allegations in the bill on those subjects, and the testimony offered to support them differ widely.

A good deal was said about her leaving St. John's Church, which she and other members of her family had attended for years, and going to the church which her nieces attended,

but that is a church of her own faith, and it is not strange that she would prefer to go with her nieces. It certainly was not evidence of undue influence over her, and she did sometimes go alone to St. James Church because the hour when masses were said was more convenient. And there is no evidence whatever that her nieces were opposed to her going to St. Johns Church, if she wanted to do so. She had some jewelry made into a chalice for St. John's Church. There was some comment on the fact that her nieces went with her when she ordered that to be made, but we cannot cut the evidence in two, and use the part that the plaintiff deems favorable, that they went with her, and leave out the rest of that testimony, that they went because she requested them to do so. That is no evidence of influence over her, as most persons, especially of her age, would prefer to have some friend or friends to advise with when about to have made a gift of value, especially one of that kind, which was to be given to a church with which she and her family had been connected for many years. So when it was completed and ready to be sent to Monsignor Devine of St. John's Church, Mary A. Farmer testified that she took it to him, but explained why it was—that her aunt had a cold and for that reason did not want to go out. The sexton of St. John's Church testified that Bridget paid for the rent of a pew up to July 1, 1912, when she said there was no use paying the rent any longer, as she did not use the pew, and gave it up. Some comment was made on the testimony of Mary A. Farmer, that she had said to her nephew, the plaintiff: "Jim, if Aunt Bridget gives up that pew, Monsignor Devine will blame my sister and me for it," but she explained that, as she and her sister had left St. John's Church and had gone to St. Ignatius Church, and as their aunt was then living with them, Monsignor Devine might think they were the cause of her leaving. That was surely not evidence of undue influence over her aunt, but it rather indicated that she would have preferred that her aunt would not give up the pew, which she

did, or she might very well have thought that Monsignor Devine might have such an opinion of the reason for her leaving. We have referred to these matters connected with her church (St. John's) at some length, because they were dwelt on a good deal by the plaintiff, but in our opinion they were all satisfactorily explained. There was, however, nothing to show that either of the defendants had anything to do with her leaving St. John's Church, or that she had done so as a result of influence over her by them.

Some stress was laid on the fact that Miss Harrison had gone to the house twice after Bridget went to live with her nieces, and that they had refused to let her see her. It is contended that that was a part of the scheme of the defendants to prevent anyone from seeing Bridget who might influence her to leave her money to any other than the defendants. But Miss Harrison had sometime before simply been employed in the house of Bridget and Margaret Quinn as cook and house maid, and she made the calls on her just after the death of Margaret Quinn. She was then living out with another family she had lived with for many years. The defendants testified that their aunt had said she did not want to see Miss Harrison, and there is nothing to contradict that statement. In that connection, it may be said that while the plaintiff contends that neither he nor any of his family were permitted to see Bridget alone, the evidence shows that during the time Mary A. Farmer was at a hospital as a result of an injury, Mary B. Farmer went frequently to the house and had many opportunities to talk with Bridget alone. Moreover, the uncontradicted evidence shows that on a number of occasions she did talk with Mary B. and her mother on her way from St. John's Church, and there were doubtless other occasions when they or some of them could have seen Bridget alone if they desired to do so. The fact that when one of them would call at the house and either Margaret or Mary A. Farmer was not in the room, the one who was would call the other and tell her that the party who had

called was there, would be evidence of ordinary politeness, rather than an attempt to prevent the caller from talking with Bridget alone. When the plaintiff called to see Bridget on business connected with Patrick Quinn's estate, it was proper that Mary A. Farmer, who was the other trustee, should be present, as the plaintiff was the active trustee and Mary A. Farmer knew very little as to what he was doing in the trusteeship excepting what he told her, and from the papers he called upon her to sign. As he seems to have taken no receipts from Bridget for monies he paid her, it was proper and desirable for him that the other trustee be present when he paid the money to her.

The evidence does show that Mary A. Farmer went to bank with her aunt frequently, indeed always, and went with her when she was shopping, although a number of times spoken of in the testimony purchases were made by Bridget when she was alone. But if the fact that a niece accompanied an old aunt, over eighty years of age, when she went to church, or to the stores, or other places, must be held to be evidence of undue influence, old people might be cut off from much protection and care from those who were to be beneficiaries under their wills, or in other ways. A good deal of reliance was placed on the fact that there was no evidence that Bridget ever told anyone that she intended to have her account in bank so entered that her nieces or niece would get the benefit of it at her death, excepting what Mary A. and Margaret M. Farmer testified to, but on the other hand, there is no evidence that she ever expressed any intention of so leaving this fund that the plaintiff and his brother and sisters would get the benefit of it, or that she would provide for them, beyond the evidence of the plaintiff himself, his sister, Mary B. Farmer, and his mother, two of whom were financially interested and the other, their mother, was interested in her children getting the money. The plaintiff was not competent to testify as to the statements of Bridget, and there was no possibility of contradicting those testified to by Mary

B. and Mrs. Farmer, as the only other person present, Bridget, was dead, excepting by what Bridget actually did. But it is not necessary to suggest that either of those witnesses swore falsely. They only testified that Bridget told them a number of times that she was saving her money for Mary A. and Margaret M. Farmer and the children of James F. Farmer. It is altogether probable that Bridget thought and expected that the children of James F. Farmer would eventually get what she left, as upon the death of her nieces, Mary A. and Margaret M. Farmer, they would be the nearest relations of Bridget, as well as of Mary A. and Margaret M., who were then living. It is possible that she may have had some understanding with Mary A. that she would, at her (Bridget's) death, have the account so entered that it would go to Margaret M. at Mary A.'s death, if she survived her, and to Mary A. if she survived Margaret M., and that it should eventually go to the children of James F. Farmer. But while that is possible, there is no evidence on the subject, excepting what might be inferred from the evidence of Mary A. and Margaret M. Farmer, which was excepted to by the plaintiff, and is inadmissible. If it could be considered, it does not support this bill of complaint, as the plaintiff could only get relief on the ground that Bridget was mentally incompetent to have the account entered as it was, or that she did not understand the effect of it, or that it was done as a result of undue influence and dominion over Bridget by Mary A. or Margaret Farmer or both. The plaintiff unquestionably failed to produce such evidence as would justify the court in giving such relief, and if it be said that, by reason of Mary A. being one of the trustees of the Patrick M. Quinn estate, and the other relations between her or her and her sister and Bridget, the burden is on them to show that Bridget understood the effect of the transfer of the bank account, and that it was not made as a result of undue influence, we are of the opinion that they have sufficiently met the burden. As we have seen, Bridget was familiar with such entries in

bank and had actually received the benefit of them. In the absence of something to the contrary she must be held to have known what they meant. But the evidence of Michael S. Haas, treasurer of the Metropolitan Savings Bank since 1912, and before that teller, together with the experience Bridget had had with such accounts in bank, leaves no room to seriously doubt that she understood what she was doing, and the effect of it. It was argued that Mr. Haas was not sufficiently explicit as to what occurred at the time the deposit was made on August 1, 1912, but he was as emphatic and as positive as it could be expected for a bank officer to be, after a lapse of seven years, unless there had been some unusual occurrence in connection with the transaction. Bridget had peculiar and unusual opportunities to know what was required and what the entries meant, as we have seen above. JUDGE McSHERRY said, in *Milholland* v. *Whalen,* 89 Md. 212, where there was a similar entry in the Metropolitan Savings Bank in an account with Miss O'Neill, intended for herself and Mrs. Whalen, "According to all the cases, if she intended to accomplish this result, it was perfectly competent to her to do it, and to do it in that way; and when done it constitutes a complete change in the ownership of the money. Her intention to do precisely what was done is not left in doubt; for the testimony of the bank's teller is clear and emphatic that the entry represents exactly and literally what Miss O'Neill desired to consummate." Again on page 216, he said: "It is the donor's act which originates the trust, and it is the intention with which he does the act that is material. The entry, unexplained, is a sufficient declaration of trust, because it indicates an intention to establish a trust, but this may be rebutted." See also *Litlig* v. *Mt. Calvary Church,* 101 Md. 494; *Mulfinger* v. *Mulfinger,* 114 Md. 463; *Stone* v. *National City Bank,* 126 Md. 231; *Giltz* v. *O'Malley,* 135 Md. 281.

Great reliance was placed by the plaintiff on the fact that Mary A. Farmer was one of the trustees of the Patrick M.

Quinn estate, but it must not be forgotten that the plaintiff was also one of the trustees, and was the active one. He collected and paid over the money to Bridget. There is not a. particle of evidence to show that Mary A. Farmer ever handled that money after it was received by Bridget, and she did not deal with Bridget in reference to any of the property held by the trustees. But as we have already indicated, if it be conceded that there were such relations between Bridget and the defendants as to cast the burden on the latter, and for the purposes of this case we will concede it, without discussing the question, we are of opinion that they have met the burden, as far as the law required them to do. What we have said above, in the absence of anything to the contrary, is sufficient. Both Mary A. and Margaret M. Farmer went upon the stand and were examined and cross-examined at length about the transactions, showing their willingness to explain them as far as the plaintiff permitted them to do so, and although we cannot take their evidence into consideration in reference to what Bridget said, or to transactions with her, the entries themselves, the evidence of the bank officers,. the proof of the familiarity of Bridget with such entries, and other matters we have referred to, are ample, in the absence of any testimony showing undue influence or attempts by the defendants to influence Bridget, to sustain the burden resting on the defendants.

In our judgment, it is clear that the transfer of the fund cannot be held to be invalid. At most, it could only be contended that Bridget intended that it should be held by Mary A. Farmer in trust for herself and her sister Margaret, and the children of James F. Farmer, but whether that could be sustained need not definitely be decided in this case. · It is evident that the plaintiff could only recover on the theory of his bill, that the transfer was invalid and hence the fund belonged to Bridget Quinn and, as we cannot reach that conclusion, we do not understand upon what principle the administrator could be entitled to the fund. If it was intended

and understood that Mary A. Farmer should take it in trust at the death of Bridget, as above suggested, then the proceeding could only be by the *cestuis que trustent,* the children. of James F. Farmer, against Mary A. and Margaret M. Farmer, the account having been since entered to the joint use of the two sisters. While the oral opinion of JUDGE GORTER, as reported, is not altogether clear on that point, it is manifest that his view was that there could be no recovery by the administrator, and that any effort to enforce the trust, assuming that there was a trust, would have to be by another proceeding. He was undoubtedly right in both of those conclusions. The case of *Littig* v. *Mt. Calvary Church, supra,* is the only one that could be said to even suggest a right in the administrator of a depositor to recover a deposit made for the benefit of himself and another person, but that was a very different case from this. There the deposit was simply, "Mt. Calvary Protestant Episcopal Church, subject to the order of Kate Littig, Trustee, $500.". That deposit was made by Miss Littig, and her executor sought to have the fund decreed to be a part of her estate. The master in chancery held that the fund "should be paid to the plaintiff, as executor, but that it was impressed with a trust in favor of the defendant church, and he recommended that a decree be passed directing the fund to be paid over to the plaintiff, to be by him held in trust for and paid to said church." A decree was passed in accordance with his recommendation, and on appeal it was affirmed by this Court. The theory of the master, as shown by the record in that case, was that Miss Littig was trustee, and she being dead, her executor took the fund in trust. The fund was not treated as part of the assets of her estate, but the executor took it, so as to carry out the trust. This Court held that Miss Littig declared a trust but reserved a power of revocation, "and that her real intention as declared to one of the witnesses and testified to by him was that she wanted the church to have the money if she did not revoke the trust and use the

fund during her life." In this case, if it was intended that
Mary A. Farmer should hold the fund in trust, if she sur-
vived Bridget, as she did survive her, she became the trustee,
but when the trust was made by the entry in bank, "it con-
stituted a complete change in the ownership of the money"
(*Milholland* v. *Whalen, supra*), and Bridget was stripped "of
her individual ownership of the money and vested the money
in her in trust" for Mary A. Farmer, if she outlived Brid-
get. As Mary A. Farmer was living at the death of Bridget
she was entitled to the fund, but if she took it in trust for
her sister and the children of James F. Farmer, she so held
it, and the executor of Bridget Quinn had nothing to do with
it.

We have purposely refrained from expressing any opinion
as to whether there was such trust, for if there was and it
is desired to enforce it, it must be by a new proceeding, and
the bill of the administrator cannot be amended by making
the children of James F. Farmer parties, as there would then
be entirely new parties plaintiff. Of course, it would have
to be shown by clear and satisfactory evidence that it was
intended that there should be such trust. It may be that
Bridget was satisfied to have Mary A. join her sister Mar-
garet in the account, and trust to the survivor of them to
take care of and provide for the children of James F.
Farmer, who are of another generation.

There is nothing in the record to show that either Mary A.
Farmer or Margaret M. Farmer ever had any of the $12,-
638.60, or the $5,972.82 (included in it), which the bill also
sought to recover. The mere fact that Bridget lived in their
home is not sufficient to hold them responsible for it. They
went on the stand and denied all knowledge of it, excepting
the sum of $112, which they say they found and used for
masses, of which they allege the plaintiff was informed.

There was error in the lower court overruling the excep-
tions of the plaintiff to the testimony of the witnesses Mary
A. Farmer and Margaret M. Farmer, in so far as indicated

above, and also as to opinions given by some of the witnesses (which need not be more particularly referred to), but as, after excluding such testimony from our consideration, we are of opinion that the conclusion reached by the lower court, in refusing the relief prayed for and dismissing the bill of complaint, was correct, there was no reversible error, and the decree will be affirmed, but we will direct that each side pay its own costs.

> *Decree affirmed, each side to pay its own costs,*
> *above and below.*