JAMES F. FARMER, Administrator c. t. a., *v.* ASSO-CIATED PROFESSORS OF LOYOLA COLLEGE.

[No. 18, January Term, 1934.]

*Decided March 2nd, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Isaac Lobe Straus,* with whom was *J. Paul Schmidt* on the brief, for the appellant.

*J. Irvin McCourt* and *Edward L. Ward,* with whom were *Galvin & McCourt* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

The original bill of complaint, and the first and second amended bills, were filed by Mary A. Farmer to set aside alleged gifts by her to the defendant, the Associated Professors of Loyola College in the City of Baltimore, a corporation, the present appellee, through Rev. Father Peter J. O'Carroll, "former Treasurer and now Assistant Treasurer, of the corporate defendant." Before the suit came to trial the original plaintiff died, and on proper motion the administrator *c. t. a.* of her estate, the appellant, was substituted as plaintiff; and Father O'Carroll also died, leaving the appellee as the only defendant. On the first trial demurrers to the bill and the first amended bill were sustained, and on appeal from the ruling on the second demurrer the order was affirmed and the case remanded. The case is reported in 162 Md. 431, 160 A. 12, 18. Whereupon the plaintiff filed his second amended bill, omitting the claim included in the first bill for the gift of $20,000, alleged to have been in Liberty bonds, which was not included in the paper writing sought to be set aside, the claim for which we held was not cognizable in equity. In other respects the second amended bill does not differ materially from the bill which was before us in the former appeal.

The allegations in the second amended bill, filed on June 21st, 1932, so far as it is important to summarize them, are substantially as follows: That plaintiff, Mary A. Farmer, was possessed of a large estate, consisting almost entirely of bonds, securities, cash money, and other personal property, her real and leasehold property being a comparatively small part of her estate; that she was unmarried and sixty-three years of age; that her entire source of income was from her said estate, amounting to approximately $180,000; that the Rev. Father Peter J. O'Carroll, former treasurer and now assistant treasurer of the corporate defendant, is a priest of the Catholic faith, a member of the Society of Jesus, and one of the officiating priests of St. Ignatius Church in Baltimore City, having been treasurer of the corporate defendant

from 1908 to 1924, and since then the assistant treasurer; that the Associated Professors etc. is a body corporate, duly incorporated, and although described in its charter as an educational institution, is entirely composed of and conducted by priests of the Roman Catholic Church, and has always been engaged in the management and control of St. Ignatius Church; that the greater part, if not all, of the estate of which the plaintiff was heretofore possessed was derived by plaintiff directly and indirectly from her uncle, Patrick Quinn; that said Quinn died in 1886, leaving his estate in trust for the benefit of his three sisters, Sarah Craig, Margaret Quinn and Bridget Quinn, during their lives and the lives of the survivors and survivor, with remainder to the six children of another sister, Ann Farmer, of whom Bridget Quinn was the survivor; that four of the six children of Ann Farmer predeceased Bridget Quinn, none of them except James F. Farmer leaving any children; that James F. Farmer left five children, four of whom are still living; that the plaintiff and her sister Margaret, now deceased, were the remaining and surviving children of Ann Farmer, and after the death of Margaret the plaintiff received the estates of her uncle Patrick Quinn, and also the estates of her brothers John F. Farmer and Patrick J. Farmer; that the four living children of plaintiff's brother James F. Farmer are the only persons who would inherit and take as distributees the plaintiff's property and estate, which upon the decease of the plaintiff ought naturally and properly to go to the survivors of the Quinn and Farmer blood; that it was the definite and settled desire, intent, and expectation of plaintiff that her said estate should go to her said nieces and nephews; that the said Father O'Carroll, formerly treasurer and now assistant treasurer of said corporation, has for many years been an officiating priest of St. Ignatius Church, of which plaintiff for thirty-three years has been a devout member and communicant; that he has also been the father confessor and spiritual adviser of plaintiff for the past twelve years or more; that on or about the

22nd day of September, 1920, Margaret Farmer, plaintiff's sister, died, and after her death Father O'Carroll, by constant and assiduous clerical and spiritual attentions to the plaintiff, his parishioner and penitent, gained and acquired her confidence, faith, and trust, became and established himself as her business as well as her spiritual adviser, and acquired a controlling influence and dominion over her mind; that plaintiff, by reason of her age, lonely and grieved condition, and being debilitated in mind and body and greatly depressed and nervous as the result of the death of her sister, became easily subject to the dominating influence and ascendency of Father O'Carroll, who represented himself as acting solely for her benefit; that acting as the representative and agent of said corporation he on April 20th, 1921, influenced and prevailed upon her to deliver to him for said corporation $135,350 in United States Liberty Loan Bonds, 4½ per cent., which transaction he falsely informed and led plaintiff to believe was merely a loan, and that said bonds were returnable and would be returned to her upon her request, the interest maturing upon said bonds to be paid to her as long as the plaintiff should allow said loan to continue, and the said bonds to remain the property of the plaintiff; that he induced plaintiff to sign a paper writing dated April 20th, 1921, by taking unfair advantage of her trust and confidence in him as her spiritual and business adviser, and fraudulently misrepresenting the meaning of said paper writing as aforesaid, and that plaintiff signed said paper writing relying on said false representations, without deeming it proper or appropriate to read it, and without any other or independent advice; that she never received a copy of said paper and only recently learned that said paper writing purports to evidence an absolute gift of said bonds, the interest thereon to be paid her for life; that at all times since the delivery of said bonds and the signing of said paper writing plaintiff considered said bonds to be, and treated them as, her own property, paid income taxes thereon, and always claimed and was allowed her full exemptions by reason of such own-

ership. The bill goes on at great length dealing with subsequent occurrences, allegations as to which are well summarized in the opinion filed in the previous case, and need not be repeated here.

The prayer of the bill is: (1) That the transfer and delivery of said bonds and said paper writing be vacated and declared null and void, and that defendants be required to return said bonds with all unpaid interest. (2) For an account. (3) For discovery. (4) For general relief.

On the former appeal it was held that the bill of complaint stated a good cause of action as to the bonds now claimed, but it was held to be multifarious and therefore demurrable.

The answer denies that there was any misrepresentation or deception, and avers that plaintiff read and understood the paper which she signed, and intended the transfer of the bonds as a gift, and did not at any time consider said transfer as a loan; that she was in full possession of her faculties and of strong will; that prior to the year 1921 James Q. Farmer, one of the nephews of the plaintiff, endeavored to secure a considerable portion of the estate of the plaintiff through various means, as will more fully appear by reference to the case of *Farmer v. Farmer*, 137 Md. 69, 111 A. 464, and ever since the litigation referred to in that case the nieces and nephews of plaintiff have been very unfriendly with the plaintiff; that it had always been the long-cherished desire of the plaintiff to erect a suitable memorial in memory of the Farmer and Quinn families, and after much thought and deliberation she decided, of her own free will, without any influence from any one, to make an absolute disposition and gift of said bonds in such manner that she would be entitled to receive certain definite income during her lifetime, after which the income would cease; and that the thought uppermost in her mind at that time was to work out an arrangement whereby vexatious litigation similar to that she had been through would be avoided, and after her death nothing would have to be done to carry out her intentions, and in order to accomplish this she entered into said

agreement with the corporate defendant; that she has always been thoroughly satisfied with the arrangement made by her and as the result of which said bonds were sold soon after their receipt and the proceeds used to help pay for "Evergreen," the new home of the corporation, with her knowledge and approval; and that the original building thereon has always been known as the "Quinn-Farmer Memorial Building."

The chancellor dismissed the bill, and from that decree this appeal was taken. He held that there was a confidential relation between the plaintiff and Father O'Carroll; but in view of the documentary evidence in the shape of receipts over a period of ten years, in which the payments receipted for were expressly stated to be for interest on "gifts," plaintiff could not be heard to say that she never so intended or understood, "to say nothing of the formal paper prepared by Mr. Whelan and left with her three days for her consideration and signature, and later signed by her, and an executed duplicate copy tendered her to keep." He found other cogent facts which convinced him that she understood and intended what she did, and that in view of her life and disposition there was nothing unreasonable in what she did, but that it was the result of a definite purpose. The plaintiff entirely fails to make out a case of actual fraud or misrepresentation. Of course, the bill of complaint, although sworn to, is not evidence of the facts therein alleged in favor of the plaintiff. And testimony that the allegations therein were in accordance with statements made by plaintiff to her counsel was improperly admitted over objection.

It is a close question whether confidential relations could be presumed from the facts of this case. The weight of the testimony seems to disprove the allegation of the bill that Father O'Carroll was plaintiff's father confessor and spiritual adviser; and it is not satisfactorily established that he was her business agent, as alleged. But unquestionably their relations as priest and parishioner were very close and intimate, and, without deciding that there were confidential

relations in the legal sense, we shall consider the case on that basis; it being the one most favorable to the appellant. And in the view we take it will not be necessary to consider the questions of ratification and estoppel. The subsequent acts of the plaintiff will be considered only in so far as they reflect on the original transaction.

We are indebted to the appellant's attorney for a comprehensive survey of the whole field of judicial decision on this subject, both British and American. However, the law is so well established in this state by our own decisions, it will not be necessary to refer to English cases or to those decided in other states. And at the outset we refer to *Zimmerman v. Frushour,* 108 Md. 115, 69 A. 796, where this court definitely repudiated the supposed English doctrine that independent advice is a prerequisite to the validity of every gift where confidential relations exist between the donor and donee. That was the case of a gift from a servant to her employer. Judge Pearce, speaking for this court, analyzed the English decisions and showed that even there the cases did not support the doctrine as applicable generally. See, also, *Taylor v. Pivec,* 149 Md. 526, 131 A. 757, where *Zimmerman v. Frushour* is cited with approval. Also cited in *Farmer v. Carroll, supra.*

The only case in Maryland where it was held on the facts that absence of independent advice was fatal is *Coburn v. Shilling,* 138 Md. 177, 113 A. 761, where it was held such advice was necessary under the conditions stated, where a very ill and old man was presented by his nurse with a paper in the form of a deposit in trust, in order to comply with the forms of the bank, as a substitute for an order he had given, which was confessedly intended to enable the nurse to draw out money for his convenience. In the substituted paper the nurse was made a beneficiary.

Nor is the reservation of power of revocation necessary. *Brown v. Mercantile Trust & Deposit Co.,* 87 Md. 377, 40 A. 256. Such a reservation would seem anomalous in the case of an absolute gift.

Nor is the reservation of an income for life from the thing given, or a requirement that the donee pay interest to the donor for life, sufficient to defeat a gift. *Howard v. Hobbs,* 125 Md. 636, 94 A. 318.

What was said in *Simpson v. League,* 110 Md. 286, 72 A. 1109, may be quoted as a good starting point for the consideration of this case. There a woman over eighty years of age, without relations closer than a sister of the half blood, in pursuance of a purpose, entertained by her for a long time, to give her property to the defendant, in September, 1907, executed a deed to him of all her real estate. She had previously devised this property to him by will, but was persuaded and led to believe by the defendant, who was an acquaintance but not related, that in all probability any will made by her at that time of life would be contested and set aside by reason of her infirm condition, and was also influenced and persuaded by him that it would be better for her to place her property under his control and management during her lifetime. For the purpose of putting him in control of her property, she, on September 16th, 1907, withdrew all of the money to her credit in the savings banks and redeposited it in the same banks in her own name, in trust for herself and the defendant, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor, and also directed her counsel to prepare the above mentioned deed of said real estate conveying it to the defendant absolutely. The defendant withdrew $28,876.66 from one of the banks and redeposited it as a trust for himself and wife, and withdrew $5,000 from said bank and applied it to his own use. He testified that these changes in the bank were made by her direction. The court sustained the deed, but found upon the evidence that plaintiff did not fully understand the bank transactions, and directed certain changes to be made therein to correspond with what appeared from the evidence to have been her intention in regard thereto, so that she would get the benefit of the deposits during her life.

464

The court said: "When the aid of a court of equity is invoked to pass upon the validity of a mere gift, without substantial consideration, made by an aged and ignorant person, of what constitutes almost his or her entire estate, the transaction will be closely scrutinized; and, unless it be clearly shown that the donor possessed the requisite legal capacity, and acted freely and without undue influence or constraint in making the gift, it will not be upheld. The court in such cases will consider not only the condition of the donor 'at the time of the execution of the instrument, and the circumstances of the execution itself, * * * but also his previous life, habits, and relation to others, so as to ascertain the natural or probable objects of his bounty, and especially to discover his settled purpose, if he had any, in regard to the disposal of his estate.' Where fiduciary relations existed between the parties to the transaction, the burden has uniformly been placed upon the donee to establish to the satisfaction of the court the facts necessary to uphold the gift. (Citing a number of Maryland cases.) On the other hand, it is equally clear that the law concedes to a person of sound mind the right to dispose of his property in any manner he may deem proper, not inconsistent with its policies, and with such a person, where there is an absence of fraud or imposition, there is no such thing as an equitable incapacity, and a gift voluntarily made and completed by him will not be set aside because he subsequently changes his mind, and regrets the transaction, or because the court regards his act as absurd or improvident. *Kennedy v. McCann*, 101 Md. 651, 61 A. 625; *Bauer v. Bauer*, 82 Md. 241, 33 A. 643; *Reed v. Reed* (101 Md. 38, 60 A. 621), *supra; Gunther v. Gunther*, 69 Md. 560, 16 A. 219; *Goodwin v. White*, 59 Md. 509; *Vitters v. Beaumont*, 1 Vern. 100; *Wilson v. Farquharson*, 5 Md. 139." See, also, *Eakle v. Reynolds*, 54 Md. 305; *Frush v. Green*, 86 Md. 494, 39 A. 863; *Henry v. Leech*, 123 Md. 436, 91 A. 694.

The testimony shows that the only relatives of Mary A. Farmer, the original plaintiff, were her nephews and nieces,

on whose behalf this suit was prosecuted after her death; that by reason of a suit on behalf of these nephews and nieces, brought by one of the nephews, James Q. Farmer, administrator of Bridget Quinn, against Mary A. Farmer and Margeret M. Farmer, in which a deposit by Bridget Quinn of $82,966.45 in the name of Bridget Quinn, in trust for herself and Mary A. Farmer, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor, was alleged to have been the result of improper influences and dominion exerted over her Aunt Bridget by Mary A. Farmer. The object of the bill in that case was to have the amount in bank, which with subsequent deposits amounted to $106,933.08 at the time of the death of Bridget, transferred to or paid over to her administrator, and to require Mary A. Farmer and her sister Margaret to account for $12,638.60, alleged to have been paid to their Aunts Bridget and Margaret, with whom defendants lived, by the trustees of Patrick Quinn and unaccounted for. This bitter controversy, long drawn out, greatly distressed and incensed the two sisters, and resulted in a discontinuance of former friendly relations between the nephews and nieces and their aunts. In consequence thereof Margaret by her will devised all of her estate to her sister Mary, providing that, in the event of Mary dying before the testatrix, her estate should go to Woodstock College and to the Associated Professors of Loyola College in equal moieties; and adding a clause regretting that "the inexcusable conduct of my nephews and nieces toward my sister and myself (James F. Farmer, John C. Farmer, Mary B. Farmer and Eupha M. Mullen) make it impossible for me to remember them, or to make any financial provisions for them in this my last will and testament; they instituted legal proceedings against my sister, Mary A. Farmer, and myself, and at a time when we both were in a state of helplessness, physically (but thanks to God not mentally) and made allegations under oath against my sister and myself that they knew at the time to be false and without any foundation. I was very kindly disposed to my said nephews and nieces before they instituted these proceedings in the

various courts, and while I wish them no ill luck, their unspeakable conduct toward my sister and myself make it impossible for me to give them any part of my estate." For a report of the litigation referred to, see *Farmer v. Farmer,* 137 Md. 69, 111 A. 464. Margaret died on September 20th, 1920.

Defendant offered to prove by the attorney of Mary A. Farmer that she and Margaret made reciprocal wills at the same time, each containing the clause above quoted. The production of said alleged paper writing of Mary having been demanded of plaintiff, of the existence of which he said he had no knowledge, the court permitted the attorney to give secondary evidence of its contents, over the objection of the plaintiff. Under the authority of *Benzinger v. Hemler,* 134 Md. 581, 107 A. 355, if this were a will contest brought after the death of the alleged testatrix, the rule of privileged communication could not be invoked. Here, however, while after the death of the testatrix the proceeding instituted by her became substantially a contest between parties claiming under her, nevertheless it was a continuation of a proceeding begun by her. Clearly, if she had been living at the time the testimony was offered, she could have invoked the rule. We are not prepared to say that the substituted plaintiff had not the same right. However, we shall not pursue the inquiry, as it is not necessary to decide the question. The only purpose of the testimony was to show the disposition of the alleged testatrix towards the rival claimants in this suit at the time of making the challenged gifts. In our opinion there is abundance of evidence to show this without resorting to that of her attorney; so we shall entirely disregard it. If it was improperly admitted, the error was not prejudicial.

On September 27th, 1920, Miss Farmer, at her house, delivered to Father O'Carroll $80,000 in Liberty bonds, and $20,000 in cash, the latter, according to the president of the college, a special gift by Mary in memory of Margaret, and on March 1st, 1921, she delivered to him $55,000 in Liberty bonds, all of which were turned over by him to the corporate defendant. No receipt or other paper writing was executed

on either of these occasions. Some weeks after the latter date, Father McEneany, the president of the college, and Father O'Carroll, the assistant treasurer, consulted Mr. Thomas Whelan (the counsel of the corporation), "and he thought advisable, on account of the amount, we should have some testament or agreement signed up between us, both for our own protection, and for her protection, so that the money would be known to be ours and given by her." Accordingly he prepared a paper as follows:

"In consideration of the agreement by the Associated Professors of Loyola College in the City of Baltimore, a body corporate, of the State of Maryland, to pay to the undersigned, Mary A. Farmer, the sum of money hereinafter set forth, the said Mary A. Farmer doth hereby assign and transfer to the Associated Professors of Loyola College in the City of Baltimore, its successors and assigns, absolutely, One Hundred and thirty-five Thousand Three Hundred and Fifty Dollars of United States of America Liberty Loan Four and One-Quarter per cent bonds with interest coupons hereafter maturing thereto attached, and in consideration of the assignment and transfer of the above mentioned bonds with said coupons to the Associated Professors of Loyola College in the City of Baltimore by the said Mary A. Farmer, the Associated Professors of Loyola College in the City of Baltimore hereby agrees to pay to the said Mary A. Farmer interest on said principal sum of One Hundred and Thirty-five Thousand Three Hundred and Fifty Dollars at the rate of four and one-quarter per cent per annum during the life time of the said Mary A. Farmer, said interest accounting from the date when the interest coupon on said bonds was last payable by the United States of America to the holder of said bonds, and said interest being payable in semi-annual installments accounting from said last mentioned date, and upon the death of the said Mary A. Farmer, said interest payments shall absolutely cease, and no sum of money shall thereafter be due to the said Mary A. Farmer or to the estate of the said Mary A. Farmer hereunder.

468

"Witness the hand and seal of the said Mary A. Farmer and the seal of the Associated Professors of Loyola College in the City of Baltimore, and the signature of its President, this twentieth day of April, A. D. Nineteen Hundred and Twenty-One.
"Witness
"Peter J. O'Carroll, S. J.
"Mary A. Farmer                [Seal.]
"Joseph A. McEneany, S. J. [Seal.]
"President Loyola College."

"Before it was executed, at the suggestion of the lawyer, we brought it to Miss Mary Farmer and left it at her home with her, and she read it and studied it." It was left with her three days, before it was executed. At the end of the three days Father McEneany and Father O'Carroll went to her home and the paper was executed in duplicate by her and by Father McEneany as president, and witnessed by Father O'Carroll. "Mary Farmer read it and I asked her, 'Mary, Is that perfectly satisfactory, and she said, Yes, that is just what I want.'" One copy was given her, "put in her hands and she refused to accept it, she said she wished to have no papers around the house to let her nephews and nieces know where her money had gone." The papers were carried back to the college and put in the safe. These bonds were soon after that sold and the proceeds used to help purchase "Evergreen," for which $225,000 was paid. "When the money was spent, Mary visited us there, * * * and I told her that that was to be called the Farmer-Quinn memorial, in memory of her purchase. This she objected to, saying that she wished no name or tablet put on anything, but she said, 'Dedicate that to the Immaculate Conception in memory of the Farmer-Quinn family, and I will give you a statue to commemorate that.'" Father McEneany further testified that she attended a Novena at Evergreen in March, 1925, every day during the nine days. He and a number of other witnesses testified that on April 20th, 1921, she was of sound mind and acute intelligence and a woman of strong

will. Indeed, her mental capacity was not questioned by any one. She was obliged to use a crutch or a cane on account of a broken hip. All the witnesses agreed that she was deeply religious and devoted to her church. Father Delihant testified that he was her confessor and spiritual adviser from 1919 to 1932; that some time in 1921 or 1922, in a conversation about the disposition of her property, there was some question of a nephew and a niece, and "I said, 'Mary, it is good to take care of your relatives.' " She said: "I have no sympathy with these two; they have treated me badly and I feel my money is best spent by giving it to the college."

Several other witnesses, friends for many years of Miss Farmer, testified as to conversations with her in regard to her relatives and the disposition of her property. One said: "She told me that she had no relatives whatever and what she had she gave to Loyola College, and when she died they would be greatly surprised as there would be nothing over." Another said she told her she had "given it (her property) to the Associated Professors of Loyola College and was sorry she didn't have more to give to complete what buildings they needed." Another, that she told her she had given everything to Loyola. "She would speak of her sister's death, and the sorrow that was brought upon her. She seemed to think the case in court hastened her sister's death, and there was a certain bitterness every time she spoke." Another, that in 1924 "Miss Mary told me that she had given everything to Loyola, that when she died they would be greatly surprised as there would be nothing over for her relatives, she did not want them to have it * * * that she did not want any of the relatives to visit her."

That there was an estrangement between Miss Farmer and her nephews and nieces after the litigation referred to is shown by their own testimony. Three of them did not visit her after that until she was taken to the hospital in June, 1930, and thought to be in a dying condition, in a period of twelve years, and the other, only twice during that period, the last time in 1925.

We take it, therefore, to be proved beyond a question that in September, 1920, and March, 1921, when these bonds were delivered, and in April, 1921, when the paper writing was signed, Miss Farmer had no relative to whom she desired her property to go, after her death; that so far as the record shows, her only interests were St. Ignatius Church and Loyola College. She reserved for herself, during her life, an income equivalent to the entire income from the bonds, which was ample for her needs, as shown by the large accumulation of income in her hands at the time she was taken to the hospital.

So much for the reasonableness of the gift. The contention that she thought she was making a loan is refuted (1) by the unreasonableness of the proposition itself; (2) by the oral testimony above set out of her statements to a number of people; (3) by her failing to take a receipt for $135,350 of coupon bonds turned over to defendant, and by her borrowing from it money at six per cent. when she could have recalled enough of her own money to meet her demands on which she was only receiving four and one-quarter per cent.; (4) by the paper writing of April 20th, 1921, and the receipts she signed.

(1) What possible reason could the defendant have had to borrow bonds which were to be held for the owner and all the interest thereon paid to her, and the bonds returned on demand?

(2) She repeatedly stated that she had given the property to the college.

It is argued that her income tax reports show that she considered that she still owned the bonds. In the first place, her statements in those reports were improperly admitted. They were self-serving declarations. But even if they be considered, it does not follow necessarily that, if she did not think she owned them, she was consciously swearing falsely. Interest was paid her regularly as the coupons came due and exactly the amounts of the coupons. She might in good faith have thought of the interest as coming from the bonds— that she had a life interest in them. Of course, that would

have been confusion of thought after she knew the bonds were sold, but people do not always think things through. In any event, it would be her uncorroborated statement against the testimony of Father McEneany, that she knew the bonds had been sold, and that of four other witnesses, that she told them of her gift to the college.

(3) On these inconsistencies extended comment is unnecessary.

(4) We said in *Farmer v. O'Carroll, supra*: "While the plaintiff was a layman, yet she was lettered, and so would have known, if she had read, the nature and effect of the clear and simple document which she signed." And the testimony is that she did read it and had it in her possession three days before signing it.

Then, too, she signed numerous receipts for interest, some of which were sent her by mail, and therefore in her possession long enough for careful inspection, such as the following: "April 15, 1926, Received of Associated Professors of Loyola College in the City of Baltimore, $2,663.67 six months interest due on this date on gift of $125,350.00 at 4¼% during Miss Mary A. Farmer's lifetime." "October 15, 1929. Received of Associated Professors of Loyola College in the City of Baltimore per Peter J. O'Carroll, S. J., Asst. Treas., $2,663.67 in full payment of interest due this date on gift of $125,350. Interest payable only until my death." Is it within the range of possibility that such receipts would have been signed throughout a period of years if the transaction had been intended by Miss Farmer as a loan?

A large part of the record is taken up with happenings after the accident in June, 1930. But in the view we take of the case they have no material bearing on the issue here involved. Assuming Miss Farmer's competency after the accident, and that in the execution of her own free will she desired to revoke the gift she had made, it was beyond her power to do so, if it was valid when made.

As was said in *Jervis v. Jervis,* 127 Md. 133, 138, 96 A. 265, 266: "In *Reed v. Reed,* 101 Md. 141, 60 A. 621, it is

said: ' "A gift obtained by any person standing in a confidential relation to the donor is *prima facie* void, and the burden is thrown to the donee, to establish to the satisfaction of the court that it was the free, voluntary, and unbiased act of the donor." This means, however, that if it was the free and voluntary act of the donor, a gift deed is as good as any other and must be measured by the same standard. It won't do to make such a conveyance, and, because the grantor should subsequently regret it, to come in and ask the court to undo the act so deliberately done. Let the grantee * * * overcome the *prima facie* case, the court would never strike down the deed either to gratify the caprice of the grantor or because subsequently thereto the relations of the parties changed.' "

There were numerous exceptions reserved to rulings on evidence. We have examined them carefully and find no reversible error. None was urged in plaintiff's brief, except that to the admission of the testimony of wills alleged to have been made by Miss Mary Farmer, which we have discussed; and to the admission of the will of Margaret Farmer. This will was admissible, if for no other reason, because part of the estate disposed of by Mary came to her under Margaret's will, and, in disposing of that part at least, the recipient would naturally be influenced by the wishes of the donor.

Our conclusion is that the defendant has met the burden cast upon it to prove that the gift was the free and voluntary act of the donor, and that the plaintiff has failed to prove that the transaction was intended to be a loan. Considering her situation and habits of life, and the absence of any natural objects of her bounty at the time of the challenged gift, we find nothing unreasonable or unrighteous in the transaction so far as it affected her personally; and it is abundantly proved that she entertained a deep conviction that her collateral relations had forfeited all claim to her consideration. In *Todd v. Grove,* 33 Md. 188, where there was a gift to a brother to the exclusion of the wife and other relatives of the donor, this court

said that it would have been a strong defense if there had been proof to support the charge that the conduct of the wife had estranged the husband, and commented on the absence of proof that the donor was not on friendly terms with his other relatives. It will be found, we think, on an examination of the Maryland decisions where gifts have been set aside in the absence of proof of actual fraud or undue influence, that there was some element of unreasonableness or unrighteousness in the transaction denounced, viewed from the standpoint of the donor at the time of making the gift.

*Decree affirmed, with costs.*