NEW YORK COUNTY—HON. CHARLES P. DALY, ACTING SURROGATE—November, 1862.

## DELMOTTE *v.* TAYLOR.

*In the Matter of the Estate of* GEORGE W. MILLER, *deceased.*

The deceased was in his last illness, suffering from an incurable disease ; he had just made his will, and every thing tended to show that he was in present apprehension of death. *Held,* that under such circumstances, a gift of his horses, furniture, wearing apparel, and watch, was a gift *mortis causa,* and not *inter vivos.*

The policy of the law is against gifts *mortis causa ;* and to sustain them, the most clear, circumstantial, and satisfactory proof will be required.

To constitute a valid *donatio mortis causa,* there must be, if the gift is by parol, an actual delivery and acceptance of the thing, so far as it is possible. The mere fact that it has passed into the possession of the donee, even by the act of the donor himself, is not enough.

However apparent the intention of the deceased to make a gift, such intention of itself is unavailing to sustain it.

The deceased, in his last illness, expressed a desire to his daughter that she should have his carriage and horses, but did not request her to take possession of them, nor direct the stable-keeper to deliver them to her ; nor did it appear that there had been any actual transfer or change of possession, though they were used by her afterwards, and the coachman received his orders from her.

 *Held,* not such a delivery by the donor to the donee, as was necessary to complete the gift.

So, where the deceased gave his daughter the furniture in his rooms, the keys to which were given her by her husband, and she subsequently removed the furniture to her residence, though nothing else appeared showing that she took possession of it with the donor's knowledge and assent,—*Held,* not sufficient to consummate the gift. The fact that the furniture was in the donee's possession before the donor's death, is not, of itself, sufficient to warrant the presumption that there was an actual delivery. A mere taking possession is not sufficient. It should appear to have been done with the knowledge and acquiescence of the donor.

On the accounting of Alexander Taylor, and Halsey W. Knapp, executors of the last will and testament of Geo. W. Miller, objections to the account were filed by Mary J. Delmotte, Sneckner, and others, next of kin, on the ground that certain furniture, a gold watch, and horses and carriage, belonging to the estate, were not accounted for. It was claimed, on behalf of the executors, that the articles specified had been taken possession of by Mrs. Taylor, a daughter of the testator, under a gift to her, by the testator, shortly before his decease.

CHARLES F. SANFORD, *for the Executors.*

WM. E. CURTIS, A. R. DYETT, *and* E. W. DODGE, *for Next of Kin.*

THE SURROGATE.—All the other questions in this case having been disposed of, it remains but to consider whether the

property, for which the executor insists he is not to account, was disposed of by the testator, as a gift *inter vivos*, or *mortis causa*. This property consisted of the furniture of his private apartments, his carriage and horses, his gold watch, and his wearing apparel. The testator was the proprietor of an establishment in Broadway, known as the City Assembly Rooms, in connection with which he had in the same building two rooms furnished for his private use. During his illness he was removed from these apartments to the residence of his son-in-law, the executor, where he died. On his removal, these apartments were locked up, and the key was in the possession of Taylor, the son-in-law. Taylor testifies that the deceased, during his life, gave the furniture in these rooms to his daughter, Mrs. Taylor; but his testimony on this point is loose, and, in my judgment, far from satisfactory. After stating that the testator gave his wearing apparel and his carriage and horses to his daughter, he says, "I don't know about the furniture, but I gave her the key of the room in which it was." But afterwards, in the course of his examination, he said that the testator gave her the furniture about six weeks before his death. He could not say whether it, or the horses and carriages, were given to her first, nor whether it was before or after the execution of the will, nor who was present except himself, the testator, and Mrs. Taylor, though it was his impression that there was somebody else in the room. He says that the testator said, as near as he, Taylor, could recollect, "My daughter, I give you the furniture in my room." That it was in the evening—that the testator was not in his bed, and that he did not say any thing, then, about his will. That afterwards he, Taylor, gave Mrs. Taylor the key of the rooms, and that two or three weeks before the testator's death, she ordered part of the furniture to be removed to her residence. That he did not know whether it was all removed at one time, or who did it, or whether it was stored.

Sneckner, the brother of the deceased, testified that he saw one load of the furniture "loading up," as he expressed it, on

the day of the testator's death.   Mr. Potter, the professional
gentleman who drew the will, testified that he had a conver-
sation with the deceased, some days after the execution of the
will, in reference to the disposition of his property otherwise
than by the will.   That, as nearly as he could recollect, he
called on Mr. Miller one evening, and that Miller stated to
him that he omitted in his will to provide for a matter rela-
ting to a carriage and horses, and inquired whether it was
necessary to have the will altered, or whether he could dis-
pose of them by giving them away : that he stated that he
had a pair of horses which, or one of which, had been very
long in use by him, and to which his daughter was very
much attached, and which he wanted her to have : that he,
Potter, told him that it would not be necessary to alter his
will ; that he could dispose of it by gift : that he then sent
for Mrs. Taylor, and that she came into the room, and that
the substance of what had transpired was communicated to
her.   That he then expressed his desire that she should have
whatever the conversation related to : that as nearly as the
witness could recollect, the testator's language was, that she
should have what he then gave her : that he could not recol-
lect the language which the testator used when he addressed
his daughter in regard to the horses and carriage, but that,
according to his best recollection, the conversation embraced
his pair of horses, his carriage, and the harness he had used.
Nothing appears to have been said or to have occurred on
the occasion respecting the disposition of the other property.
Taylor was also present at this interview, and he testified
that Miller gave the horse and carriage to his daughter at
that time, and that she took possession of the carriage and
horses several weeks before the testator died.   It does not
appear that there was any actual transfer or change of pos
session from the stable where they were left.   Taylor merely
says, " They were brought from the stable in Mercer-street
to her house ; I mean to say that they were subject to her
orders ; I know that the coachman took his orders from
her :"—acts which show an acceptance of the gift by Mrs.

Taylor, but which furnish no evidence of an actual delivery on the part of the testator.

All the testimony in respect to the wearing apparel is a mere general statement of Taylor that the testator's wearing apparel was given to his daughter, and that she took possession of it during his lifetime. How, where, or under what circumstances the gift was made and consummated by a transfer of the possession does not appear, nor any thing further upon the subject, except the statement of Taylor that there was a trunk at her residence containing the testator's apparel; and all that appears in respect to the gift of a watch is found in the testimony of Taylor, to the effect that he believed the testator gave it to his daughter to keep for his son, after the testator's death.

It is manifest from the nature of the property, consisting, as it did, of his wearing apparel, his gold watch, the furniture of the rooms which he occupied, and his carriage and horses, that what the testator intended was a gift *mortis causa*. It was his last illness; the disease of which he died is one that is generally found to be incurable; he had just made his will, and every thing tends to show that he was in present apprehension of the near approach of death. Under such circumstances, the presumption would be that what he intended was a gift of that nature, and not an unconditional disposition of the property.

To constitute a valid *donatio mortis causa*, there must, if the gift is by parol, be an actual delivery of the thing, so far as it is possible to make it. The mere fact that it has passed into the possession of the donee, even by the act of the testator himself, is not enough (*Hawkins* v. *Blewitt*, 2 *Esp.*, 663); but the circumstances must be such as are consistent with the presumption that he had parted with all dominion over it, subject only to its revocation upon the happening of any one of those events which make such a gift revocable, and distinguish it from a gift *inter vivos*. Whatever doubt may have existed in consequence of some ill-considered cases and loose dicta (*Spratley* v. *Wilson*, 1 *Holt's N. P.*, 10; *Welley*

v. *Borran*, *Clayton*, 135; *Hudson* v. *Hudson*, *Latch*, 214; *Brooks' Abm.*, *Trespass*, 303), of the necessity of an actual delivery, they have been put an end to by numerous rulings since the decision of LORD HARDWICKE, in *Ward* v. *Turner* (2 *Ves.*, *Sr.*, 431). "Tradition or delivery," said that eminent judge, "is necessary to make a *mortis causa*." "Both by the civil law, and the law of England," says BARON PARKE, "there must be, in this kind of donation, an act of delivery." (*Bunn* v. *Markham*, 7 *Taunt.*, 224.) It is now, said Chief-justice ABBOT, the well-established rule that a *donatio mortis causa* does not transfer the property without an actual delivery. (*Irons* v. *Smallpiece*, 2 *Barn. & Ald.*, 552.) And to the same effect are numerous American authorities. The testator may indicate his intention in the strongest way, as in *Bryson* v. *Browrig* (9 *Ves.*, 1); where, after having declared his intentions to put his daughter upon an equality with another daughter, he ordered his wife and executors to take two securities, a bond and a mortgage, out of a drawer where they lay with other securities: which she did, and by his directions placed them by themselves in another drawer, for and as the property of the daughter, and the testator pointing them out to the daughter, and referring to them several times afterwards as her property. In conformity with which directions his wife, after his death, as his executrix, paid over the amount of the securities to the daughter. In *Bunn* v. *Markham* (*supra*), where a testator even went further, by causing certain bonds, bank-notes, and guineas to be taken out of his iron chest, and sealed up in his presence, directing the amount of the contents to be written upon the package, with the words, "For Mrs. and Miss C.," and then further directed his brother to replace them in the chest, to lock and seal it up, and ordered it to be delivered to one of his executors; and yet in both of these cases, where the intention was certainly manifested as strongly as in the case now before me, it was held that the gift was not good, for the want of the essential requirement of an actual delivery and transfer of the property into the possession of the donee.

The rigid adherence to this rule is, to prevent the abuse which would occur if a man's property could be disposed of, after his death, by the mere testimony of a witness as to his mental intention. In the Roman law, from which the validity of such gifts is derived, unusual solemnities were required as a security against fraud. It was requisite that both donor and donee should be present at the time of the gift; that it should be made in the presence of five witnesses; and that it should be limited in point of value. (*Dig. Lib.*, 39, tit. 6; *Cod. Lib.*, 8, tit. 37; *Strahan's Domat*, part ii., book iv., tit. 1, § 23.) The common law did not require all these formalities, but its policy has been uniformly against the encouragement of gifts of this nature. (*Harris* v. *Clark*, 3 *N. Y.* [3 *Comst.*], 93, 121; *Spratley* v. *Wilson*, *Holt's N. P.*, *Reporter's Notes*, 10.) LORD HARDWICKE even went so far as to express his regret that all gifts of the kind had not been prohibited by statute. (*Ward* v. *Turner*, 2 *Ves.*, *Sr.*, 437.) They operate like legacies, taking effect only upon the testator's death; and as the law, to prevent perjuries and fraudulent attempts to secure a man's property after his death, has rigidly insisted upon certain formalities in the publication of last wills and testaments, and has prohibited the making of nuncupative wills, except by soldiers while engaged actively in military service, and by seamen while upon the sea, it is essential that something should be required in the case of gifts which are to have all the effect of a disposition of property by will, which will serve equally to prevent abuse; and hence the courts have settled down upon the rule, that there must be an actual delivery by the testator of the thing bestowed, and an acceptance and a reduction of it into his possession by the donee, to consummate the gift; and being once adopted as a rule upon broad grounds of public policy, it must be the test in every case, however strong may be the evidence otherwise to show an intention to make such a gift. As a further security, moreover, the law requires, to sustain a donation *mortis causa*, the most clear, circumstantial, and satisfactory proof to support such a disposition. Says LORD St. LEONARDS,

in *Thompson* v. *Heffernan* (4 *Drury & Warr.*, 285), "I should require not a mere general statement of the fact of a gift having been made, but to be informed of the most minute particulars;—the amount, how it was given, when, where, in whose presence, and in what condition of mind and body the alleged donor was; in fact, all such particulars as might be expected in a fair transaction."

That the testator intended, in the present case, to bestow the carriage and horses upon his daughter, I do not entertain the slightest doubt; but there was wanting what the law requires, an actual delivery of them into her possession. Any act evincing an intent to deliver them, would be sufficient (*Goodrich* v. *Walker*, 1 *Johns. Cas.*, 253); but there is nothing shown by the evidence but the intention to give, which is not enough. What will constitute an actual delivery depends more or less upon the circumstances of each particular case. The delivery of the keys of the place where the thing intended to be given is kept, is a delivery of the possession, as it is the means whereby to come at the possession. (*Ward* v. *Turner*, 2 *Ves.*, *Sr.*, 437.) In *Penfield* v. *Thayer*, *Public Administrator* (1 *E. D. Smith*, 305), a judgment in which I concurred, it was held that a gift by the intestate in these words, "My trunk, up-stairs, and what is in it, I give you; there is enough in it to take care of you for a spell,"—the trunk being in a room in the common occupation of donor and donee, in a boarding-house,—followed by the donor immediately quitting the house, without any intimation of an intention to return, though he did return afterwards, was a good delivery, though we were of opinion that the point was one of great embarrassment and doubt. In *Smith* v. *Smith* (1 *Strange*, 955), a *nisi prius* case, it was shown that the intestate lodged at the defendant's house; that he had furniture and plate there; that he had said whatever he had brought there he never intended to take away, but give directly to the defendant's wife; and that when he went out any time, it was his custom to leave the key of his rooms with the defendant; and this was thought to be such a mixed posses-

sion as to dispense with any further act of delivery to consummate the gift. This case, however, has been frequently questioned. In *Royston* v. *Hankey* (3 *Moore & Scott*, 381), where the intestate had lived for five years in the house of his only child, under an agreement to pay her two shillings a week, and had, upon her premises, a cow, two calves, an ass, and some furniture, and had frequently told her that she was to have the animals and the furniture for what he owed her, repeating it a few days before his death, the court, though they thought the case was not free from doubt and difficulty, were of opinion that as the deceased had agreed that the property should be taken in satisfaction of his indebtedness, and as the property was all upon her premises when he declared that she should have it for what he owed, that was a sufficient delivery. In fact, nothing more could be done, as the property was all under her own roof, and no asportation or change could be necessary. But in *Huntington* v. *Gilmore* (14 *Barb.*, 243), where the testator, in his last sickness, and a few days before his death, conveyed a farm to his sister, on which she had resided for some time previous, and at the same time told her that there was personal property upon the farm, naming some of it, and that he would give it to her; it was held that there was no sufficient delivery of the property to support a gift; that the property was several miles off, and there was no act, nothing but words. When it is remembered that the sister and her husband were in actual occupation of the farm, that the property intended to be given was, in fact, in their possession, and that the testator had just executed a conveyance of the farm to his sister, this case is a very strong one, to show how strenuously the courts insist upon an actual delivery, and how unwilling they are to sustain gifts of this nature. The same reasons of public policy which led to the adoption of this rule, induced the enactment of the Statute of Frauds, and the course of modern decisions has been to construe the Statute of Frauds strictly—to give no effect to mere words depending upon the memory or truthfulness of witnesses, un-

less they are accompanied by some act. It may be said that a man stretched upon a bed of sickness, and in present apprehension of the approach of death, can be expected to make such delivery only as is possible under the circumstances, and that the property he intends to give may be of such magnitude, or may be so situated, as to make an actual delivery of it impossible. If so, then it is not a proper subject for a gift *mortis causa*. The Roman law wisely restricted such gifts to an amount limited in value; and we conform to the spirit of that judicious rule by insisting, in every case, that all the requisites of an actual delivery shall be complied with. If a man will not or cannot put his intentions in writing, and he wishes to bestow what is not in his power actually to deliver, it is better that such gifts should fail, than that the door should be opened to the frauds, abuses, and perjuries that would follow if the law recognized that a dying man could bestow personal property, of any kind or value, merely by word of mouth.

In the present case, there was no impediment to an actual delivery on the part of the testator. If he had requested Mrs. Taylor to take the horses and carriage into her possession, and she had done so, or he had sent a message to the stable-keeper to deliver them to her, and they had been delivered accordingly, the gift, in my judgment, would have been consummated. But nothing of this kind has been shown. There were acts, on the part of Mrs. Taylor, amounting to an acceptance of the gift; but none, on the part of the testator, showing that he had delivered the property into her possession.

In respect to the furniture, there was a change of possession. But nothing to show that it was done with the knowledge or acquiescence of the testator. The fact that the furniture was in her possession before his death, is not of itself sufficient to warrant the presumption that there was an actual delivery. (*Kenny* v. *The Public Administrator*, 2 *Bradf.*, 319.) It should appear that she took possession of it with the knowledge and assent of the donor; for without this,

nothing is shown on his part but the intention to give, which is not enough. I am not satisfied, moreover, with the evidence produced to establish a gift of the furniture.

It rests upon the testimony of a single witness. That witness is the husband of the donee, and the executor who is required to account for it; and his testimony is too loose, vague, and general, to come up to the requisite of LORD ST. LEONARDS' rule. This applies equally to the gift of the wearing apparel. I should feel strongly disposed, if it were possible, to sustain the gift of the gold watch. That a dying father should desire especially to leave such a memento to an only son, and being absent, should give it to his daughter to be delivered to him, is most natural and probable; and that probability is heightened by the fact, that the watch was afterwards delivered by Mrs. Taylor to her brother. But the difficulty is, that there is no evidence whatever of the fact of the gift. Mr. Taylor does not swear to the knowledge of any declaration or act of the testator respecting it, but merely states his belief that it was so given, which is not enough to sustain a *donatio causa mortis.*