# CHARLESTON.

Nellie Waugh *et al.* v. Dennis E. Richardson *et al.*

(No. 6350).

Submitted February 12, 1929.  Decided February 26, 1929.

*E. L. Hoggsett* and *David F. Sheets,* for appellants.
*Dennis E. Richardson, Lace Marcum* and *Holt & Holt,* for Richardson.

HATCHER, JUDGE:

Frank H. Richardson died November 3, 1926, leaving three daughters and one son, Dennis, his heirs. This suit was brought by the daughters against Dennis, as administrator of his father's estate, charging, among other things, that he wrongfully withholds from the estate the assets of the Easy Payment Loan Company, and the sum of fifteen thousand dollars. The son claims the loan company as a gift *inter vivos,* and the money as a gift *causa mortis,* from his father. The lower court found for the defendant.

Frank H. Richardson was married twice. These litigants are children of the first wife, who died in 1919. In 1921, he became estranged from his daughters, and in consequence made a will bequeathing practically everything to his son. In 1922, the father remarried, but never re-executed or added a codicil to the will. The second wife died in 1925.

Under section 6, Chapter 77, Code, the marriage of the father revoked the will. It is evident from the record, however, that both the father and the son were ignorant of this statute, and believed the will to be valid.

The evidence shows that the father and Dennis had been equal partners in the loan company since about 1915. Several witnesses testify that during the last few years prior to the father's death, he told them that he had given the business to Dennis. Others state that when they had gone to the father on business in connection with the loan company, he

directed them to deal with his son, saying that he had given the business to Dennis, and that then they did deal with the son. One witness testifies that several years prior to the father's death, the sign at the loan company's place of business was changed from "Frank H. Richardson & Son" to the son's name only. Three transcripts from a justice's docket were introduced. One was a suit brought in November, 1923, against F. H. and D. E. Richardson doing business as the Easy Payment Loan Company, and the other two were of suits brought in September, 1926, by D. E. Richardson doing business as the Easy Payment Loan Company. One witness testifies that the father told him he had given Dennis his money, and the government could not tax anything but the real estate. Evidence also shows that in August, 1925, while away on a visit, the father felt he must hurry home because as he said: "You know when a man is in business he has to take care of it, there is nobody who will take care of it like himself;" and that until his final illness, he remained in his office during business hours. One of the plaintiffs who worked in her father's office from 1917 to 1921 says that so far as she knew the business belonged to the father, and the son was on a salary. After the death of his father, the defendant wrote the tax commissioner as follows: "The conveyance of the Easy Payment Loan Company in 1926 was not given to me as part of my father's estate, but was sold to me for consideration. I have always owned a one-half interest in the Easy Payment Loan Company up to 1926, and I bought my father's one-half interest then, and paid him for the same."

The gift of the $15,000.00 is claimed by Dennis to have been made on October 30, 1926, at which time both the father and son knew that the father's death was imminent. The father had been engaged in a check cashing business for which he was accustomed to withdraw from his bank account considerable sums of money on the pay days of the large industrial corporations of Huntington. On C. & O. pay days ten to fifteen thousand dollars would be withdrawn for that purpose. October 30th was a C. & O. pay day, and on that morning the defendant drew ten thousand dollars from his

father's bank account to use in check cashing, signing his father's name to the check as he had authority to do. He then went to see his father, and, according to a nurse who was the only other present, "Mr. Richardson told Dennis to take fifteen thousand dollars out of the bank and use it in his business, and he also said the business belonged to him" (Dennis). The son then drew five thousand dollars more from his father's account and that evening deposited fourteen thousand to his own account, retaining one thousand in the office safe. When he deposited the money he remarked to the cashier that his father had willed him everything. J. W. Hagley states that he was visiting the father the evening of October 30th, and heard Dennis say to his father, "I put that money in the bank in my own name," to which the father replied: "That is all right, that is the way I wanted it to be." The money was not returned to the father's account. On December 6, 1926, the defendant wrote to the appraisers of his father's estate: "Some days prior to my father's death, he gave me $15,000.00 that he had on deposit in the Twentieth Street Bank of Huntington, West Virginia, and the same was drawn by him out of his account, and placed by me to my individual account in consequence of the gift."

The uncontradicted evidence of the declarations of the father that he had given the loan company business to Dennis taken in consideration with the change of the sign to the name of the son and the management of the business by the son as his own at the father's direction, warrant the view that the father had voluntarily surrendered to the defendant complete dominion over that business a year or so before his father's death. The transaction will be accordingly sustained as an executed gift *inter vivos*. 28 C. J. p. 626, sec. 15; 12 R. C. L., p. 932, sec. 10.

The evidence as to the alleged gift of money, being a gift *causa mortis*, requires a most careful analysis. 14 A. & E. Ency. Law, 1060. Note to *Ward* v. *Turner*, White & Tudor Leading Cases in Eq. (8th ed.), p. 437.

The instruction of the father on October 30, 1926, that the son *use* the money in his business does not of itself imply

a gift. The mere right to use an article does not confer a property in it. Thornton on Gifts, sec. 137. The father's alleged declaration then that "the business" belonged to Dennis, was not different in effect from prior declarations that he had given *the business,* and had given his money to Dennis. Yet after the prior expressions, he had retained as his own, cash in bank approximating $19,000.00 together with notes aggregating about the same amount. What the father presumably had in mind in making the prior statement was the gift of the loan company and the will by which he had devised all his property to his son. There was nothing said by the father on October 30th to place the statement on that day in a different light from his former expressions. No explanation appears for making a gift *causa mortis* at that time. He was thoroughly under the impression that the son would ultimately receive the money under the will. There is no testimony of a specific intention of the father to hasten or anticipate the effect of the will. No emergency had arisen to necessitate an earlier gift of the money to the son than the father intended under the will. No reason is offered why the father should change the devolution of his property as he had previously arranged it. It had been the father's custom to draw from the bank large sums of money on pay days. He had expressly authorized Dennis to sign his name to checks for that purpose. The course pursued by the son on October 30th was similar to that pursued on former pay days. It was all a part of the regular routine of the father's business and the loose expression of the father to the nurse is not of the clarity which the law requires to indicate words of a present gift. The intention of a donor in such case must be "clearly and intelligently manifested." 28 C. J. 687-8, sec 99. *Hatch* v. *Atkinson,* 56 Me. 324; *Gano* v. *Fisk,* 43 Ohio St. 462, 54 Am. R. 819, 820; *Hecht* v. *Shaffer,* 15 Wyo. 34, 41; *Walsh's Appeal,* 122 Pa. 177, 187; Thornton on Gifts, sec. 75. The witness Hagley first testified on October 3, 1927, when he detailed various remarks which he had heard the father make concerning gifts to the son, yet the witness made no mention on that day of the remark which several days later he claimed to have heard the father make

on the night of October 30, 1926. Hagley was brought back on the stand on October 12, 1927, at which time he testified to that remark. He explained that he had never told Dennis about the conversation until the evening of October 11, 1927, when Dennis came to him and asked him about it. But why should he have to inform Dennis about it, when, according to his testimony, Dennis was a participant in that conversation? It seems fortuitous, to say the least, that Hagley should have been present at the exact moment the father ratified the appropriation of the money to Dennis. It was singular that the witness should be able to quote, after approximately a year, the exact language of the father in regard to a matter in which the witness had no interest. It was also remarkable that when Hagley's memory was quickened by the visit of Dennis, the witness recalled the conversation in the same language as that used by Dennis, in his testimony. Lord Hardwicke said of a similar witness in *Ward* v. *Turner, supra,* "The witness swears to this in very formal words  *  *  *; this argues either a very strong memory or a pretty strong assurance in swearing." When the testimony of a witness is amplified after a special visit from an interested party, the amplification does not meet the high standard required in these cases. Besides, the evidence of both the nurse and of Hagley is consistent with a mere intention on the part of the father to facilitate the transaction of the usual business. The attitude of Dennis on and immediately after October 30th, does not favor his present position. It does not appear that he advanced a claim to the money as a gift *causa mortis* until the validity of the will was questioned. His explanation when he deposited the money to his own account, *that the father had willed him everything,* opposes the idea that he regarded it then as an executed gift. His attitude as well as his statements strongly supports the contention of the plaintiffs that he was appropriating the money as a potential legatee under the will, rather than as the present donee of his father. The evidence of a gift *causa mortis* is not to be favored by presumption or inference. *Devlin* v. *Savings Bank,* 125 N. Y. 756; *Hawn* v. *Stoler,* 208 Pa. 610. To the contrary, such gifts will be sustained only upon evidence which

is clear and satisfactory. *Seabright* v. *Seabright*, 28 W. Va. 413, 482; 28 C. J. p. 704, sec. 140. A leading New York case risks tautology in thus stressing the character of the proof: "Undoubtedly in such cases the proof must be clear and convincing, and strong and satisfactory." *Lewis* v. *Merritt*, 113 N. Y. 386, 391. See also *Matter of Bolin*, 136 N. Y. 177.

When the evidence for the defendant is considered in the manner required by the foregoing rules, it fails to establish clearly the intention to make a present gift. .

Suppose we disregard for the moment the ambiguity of the father's statements and accept defendant's contention as to the father's purpose. Then defendant's case fails for want of *actual delivery*. The doctrine of gifts *causa mortis* is traced back through the common law to the Roman law. The definition of *donatio mortis causa* as given in the Institutes of Justinian contemplated a tentative disposal of property in anticipation of *fatal accident*, and placed such donations on the footing of legacies. It is not clear that delivery was essential to the validity of the Roman gift. Delivery, however, could well have been dispensed with because of the requirement of Justinian that the gift be formally announced in the presence of five reputable and disinterested witnesses. Sandars Justinian, p. 218. The Roman doctrine is illustrated by the author with reference to the Odyssey of Homer, where Telemachus made certain gifts, if he be killed, to Piraeus. Through "some ill-considered cases and loose dicta," the Roman doctrine was expanded by the common law courts of England and the formality required by Justinian to prevent fraud was discontinued. This relaxation opened the door to abuses which finally brought about, in 1752, the decision in *Ward* v. *Turner*, 2 Vesey, Sr. 431. In that case Lord Hardwicke declared that symbolical delivery was insufficient to sustain a gift *causa mortis*, and that there must be *actual delivery* of the property at the time the gift was made. For, as he said, "if you take away the necessity of delivery of the thing given, it remains merely nuncupative."

From Lord Hardwicke's day to the present time *delivery* in such cases is *the rock* upon which the English and American courts have taken their stand, and mere donative words

may not prevail against it. Such gifts lack all the formalities and safeguards with which the law surrounds wills, thereby strongly tempting the commission of fraud and perjury. Actual delivery (or its equivalent) is indispensable as a security against such imposition. It is the only permissible substitute for the "unusual solemnities" with which the Roman law invested these donations. *Delmotte* v. *Taylor*, (N. Y.) 1 Redf. 417-423; *Parish* v. *Stone*, 31 Mass, 198, 204. "Around every other disposition of the property of the dead, the legislative power has thrown safeguards against fraud and perjury. Around this mode, the requirement of actual delivery is the only substantial protection and the courts should not weaken it by permitting the substitution of convenient and easily-proven devices." *Keepers* v. *Fidelity Co.*, 56 N. J. Eq. 302, 308-9.

*Miller* v. *Jeffress*, 4 Gratt. 472, is a leading case on such donations. There the court explained (p. 480-1) that such a gift is of a mixed character being partly testamentary and partly donative, and that because the law indulgently dispensed with the solemnities of a testament, delivery became indispensable to the validity of the gift. The court further stated that an actual delivery of the thing itself must be made, or if that were not practical the means of getting the possession of the thing given must be delivered. In discussing the possession of the donee following such delivery, the court said: "It is not the possession of the donee, but the delivery to him by the donor, which is material in a *donatio mortis causa*s the delivery stands in the place of nuncupation, and must accompany and form a part of the gift; an after acquired possession of the donee is nothing; and a previous and continuing possession, though by the authority of the donor, is no better." That case has been cited and approved generally throughout the United States. *Cutting* v. *Gilman*, 41 N. H. 147, 152; *Drew* v. *Hagerty*, 81 Me. 231, 243; *Hart* v. *Ketchum*, 121 Cal. 426, 429; *Allen* v. *Allen*, 75 Minn. 116-117; 14 Ency Law, 1057; 28 C. J., p. 693, sec. 107; Woernor, Am. Law of Administration (3d ed.), sec. 61, p. 176 (*124). It has been specifically quoted and followed in *Dickeschied* v. *Bank*, 28 W. Va. 340; *Seabright* v. *Sea-*

*bright, idem,* 412; and *Smith* v. *Zumbro,* 41 W. Va. 623. It has been further developed by the Virginia court in *Shankle* v. *Spahr,* 121 Va. 598, as follows: "To constitute constructive delivery, it is essential that there should be a physical delivery of some tangible object which may serve as the means of getting possession and enjoyment of the subject of the gift." Accord: *Hillman* v. *Young,* 64 Ore. 73; *Beaver* v. *Beaver,* 117 N. Y. 421; *Hecht* v. *Shaffer,* 15 Wyo. 34; *Mc-Cord* v. *McCord,* 77 Mo. 166; 21 Am. L. Rev. 742-3.

There has been some relaxation of this rule as to gifts *inter vivos,* but I find little disaffection with its application to gifts *causa mortis.* The early case of *Tenbrook* v. *Brown,* 17 Ind. 410, held in favor of a donee already in possession of the gift, solely on the theory that it would be useless to require him to first surrender his possession in order that the donor might redeliver the property in execution of the gift. That case is tacitly approved in *Devol* v. *Dye,* 123 Ind. 321, and in *Caylor* v. *Caylors Estate,* 22 Ind. App. 666, which hold that in order to consummate a gift *causa mortis* the donor must transfer "the possession of the thing to the donee in person, or to some other for his use." *Champnew* v. *Blanchard,* 39 N. Y. 111, also sustained a gift to a donee in possession for the same reason given in *Tenbrook* v. *Brown, supra.* But in the New York case, the donor delivered manually to the donee a memorandum evidencing the amount and identity of the fund (which memorandum the donee had executed to the donor upon receiving the money) at the time of the donative words. Consequently that case is no departure (though cited as such in 21 Am. L. Rev. 752) from the "true rule" announced by Chancellor Kent in *M'Kinstry* v. *Solomons,* 2 Johns 52, 56: "The delivery must be actual and real, or by some act clearly equivalent." In *Wing* v. *Merchant,* 57 Me. 383, it was held that the gift *inter vivos* of a note which was already in possession of the donee did not require an actual manual tradition at the time of making the gift. The maxim *lex non cogit ad vana seu inutilia* was invoked. *Bean* v. *Bean,* 71 N. H. 538, 543, gave due consideration to the case of *Wing* v. *Merchant, supra,* but saw no reason to relax what it terms *"the well-recognized rule of*

*law*" in that jurisdiction that "there must be a manifest intention of the donor to give, and an actual delivery of the subject at the time of the declaration or accompanying it so nearly as to be one transaction, and that an after-acquired possession or a previous and continuing possession of the donee, though by authority of the donor, is insufficient." In the forceful opinion of *Drew* v. *Hagerty, supra,* the proponents of the doctrine of *Wing* v. *Merchant* refused to extend it to a gift *causa mortis,* saying:

"The action was tried before the Chief Justice, and he ruled that to constitute a valid gift, *causa mortis,* there must be a delivery; that if the property 'be at the time already in the possession of the donee, the donor's saying to the donee, "you may have it," or "you may keep it—it shall be yours," does not pass the property in the case of a gift *causa mortis.'* We think this ruling was correct. If the act of delivery was for no other purpose than to invest the donee with possession, no reason is perceived why it might not be dispensed with, when the donee already had possession. But such is not its only purpose. It is essential in order to distinguish a gift, *causa mortis,* from a legacy. Without an act of delivery, an oral disposition of property, in contemplation of death, could be sustained only as a nuncupative will; and in the manner and with the limitations provided for such wills. Delivery is also important as evidence of deliberation and intention. It is a test of sincerity and distinguishes idle talk from serious purposes. And it makes fraud and perjury more difficult. Mere words are easily misrepresented. Even the change of an emphasis may make them convey a meaning different from what the speaker intended. Not so of an act of delivery. Like the delivery of a turf, or the delivery of a twig, in the ancient mode of conveying estates, or the delivery of a kernel of corn, or the payment of one cent of the purchase money, to make valid a contract for the sale of a cargo of grain, an act of delivery accomplishes that which words alone can not accomplish. Gifts, *causa mortis,* ought not to be encouraged. They are often sustained by fraud and perjury. It was an attempt to sustain

such a gift by fraud and perjury that led to the enactment of the statute for the prevention of fraud and perjury. See *Mathews* v. *Warner*, 4 Vesey Jr., 187, 196, note; *Leathers* v. *Greenacre*, 53 Maine, 561, 569. As said in *Hatch* v. *Atkinson*, 56 Maine, 326, it is far better that occasionally a gift of this kind should fail than that the rules of law be so relaxed as to encourage fraud and perjury.

We are aware that some text writers have assumed that when the property is already in the possession of the donee, a delivery is not necessary. But the cases cited in support of the doctrine nearly all relate to gifts, *inter vivos*, and not to gifts *causa mortis*. A gift, *inter vivos*, may be sustained without a distinct act of delivery at the time of the gift, if the property is then in the possession of the donee, and the gift is supported by long acquiescence of the donor, or other entirely satisfactory evidence. This court so held in *Wing* v. *Merchant*, 57 Maine 383, and the jury were so instructed in this case, and the defendant had the benefit of the instruction. But the question we are now considering is not whether a gift, *inter vivos*, can be sustained without a distinct act of delivery, but whether such a relaxation of the law can be allowed in the case of a gift *causa mortis*. We think not. Reason and the weight of authority are opposed to such a relaxation."

*Davis* v. *Kuck*, 93 Minn. 262, without comment upon the considerations which impelled the decision in *Drew* v. *Hagerty*, refused to follow that decision, but admitted that "a stricter rule should be applied in the case of a gift *causa mortis* than with reference to gifts *inter vivos*." In *Miller* v. *Neff*, 33 W. Va. 197, 206-7-8, the decision in *Wing* v. *Merchant* was approved as to gifts *inter vivos*, in cases where, according to the opinion, "there are no suspicious circumstances impeaching the *bona fides* of the transaction or evidence of fraud on the part of the donee." The opinion recognizes that the evidence of the delivery in respect to gifts *causa mortis* is "necessarily different" from that relating to gifts *inter vivos*. The subsequent case of *Smith* v. *Zumbro, supra*, shows no disposition to diminish that differ-

ence. "This relaxation of the rule with respect to delivery of possession in cases of gifts *inter vivos* has never been extended to gifts *causa mortis* in Virginia, nor, by the great weight of authority, elsewhere." *Shankle* v. *Spahr, supra.* "Broad grounds of public policy" impelled the rule of actual delivery and that rule "must be the test in every case, however strong may be the evidence otherwise to show an intention to make such a gift." *Delmotte* v. *Taylor, supra,* 423. See generally Woener, *supra,* sec. 61, p. 172.

There is no claim here of an actual delivery by the father to Dennis of the money or of the manual delivery of any tangible thing as the means of securing the money. Without such delivery the possession of the money by Dennis is not significant, and the alleged gift was merely nuncupative. Section 3 of Chapter 77, Code, says: "No will shall be valid unless it be in writing." To this interdiction the only exceptions are the nuncupative wills of a soldier, a sailor, and a non-resident, provided a nuncupative will is valid in the country where the non-resident is domiciled. Section 5, *supra.* The father was not of a class excepted by section 5; therefore the alleged nuncupative donation of the money is invalid under section 3. As was well said in *McCord* v. *McCord, supra:* "If such a transaction is to be held a *donation causa mortis,* the section of the statute in relation to nuncupative wills, and that requiring other wills to be in writing, signed by the testator, etc., have no force whatever."

The decree of the circuit court will be reversed in so far as it finds in favor of Dennis as to the fifteen thousand dollars.

*Affirmed in part and in part reversed and remanded.*