Nettie **SMITH**, Appellant,

v.

Hunter **SMITH**, Appellee.

No. 7573.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 20, 1958.

Decided March 7, 1958.

J. W. Maxwell, Beckley, W. Va. (L. F. Poffenbarger, Charleston, W. Va., on the brief), for appellant.

Fletcher W. Mann, Beckley, W. Va., for appellee.

Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.

SOBELOFF, Circuit Judge.

A wife brought suit to recover the value of certain unregistered interest bearing coupon bonds of the United States Government in the amount of $50,000 which she claims her husband gave her and later removed from her safe deposit box and converted to his own use. Jurisdiction rests on diversity of citizenship, as the plaintiff is a resident and citizen of Ohio and the defendant, of West Virginia.

After a hearing on the merits, the District Judge, sitting without a jury, held that the plaintiff had not sustained the burden of proving the gift of the bonds. He dismissed the action, and the wife appeals.

Hunter and Nettie Smith were married to each other twice, the first time in 1916. After they had lived together more than twenty years, a suit for divorce was brought by the husband in the West Virginia courts. It resulted in the wife's complete vindication, and showed that the husband had been guilty of improper association with other women. He then sued in Arkansas. In this action, which was uncontested, the wife appeared, and a property settlement agreed to by the parties was embodied in the decree of divorce granted the husband in July, 1943. By its terms, Hunter Smith agreed to pay his wife $150 per month as alimony, to maintain a $5,000 life insurance policy for her benefit, and to repair the roof of her house in Beckley, West Virginia. She, in turn, agreed to assign to him fifty-five shares of stock in the Fire Creek Fuel Company upon payment of $5,000, their original cost.

Mrs. Smith then rented out her house in Beckley and left to take employment as a government secretary in Washington. Three months after the divorce Mr. Smith married one of the women who had been mentioned in the West Virginia court proceedings. This marriage turned out badly almost from the beginning, but was not legally dissolved until February, 1953, in an action brought by the second wife. The plaintiff and the defendant were remarried the following September. In this case our concern is with transactions between Mr. Smith and his first wife which occurred while he was still married to the second wife.

For the first few years after the plaintiff's divorce from the defendant, there was no communication between them, but as relations between Smith and his second wife worsened, his interest in the first revived. He sent her presents of hams and cigarettes and even a Chrysler automobile, doubled his alimony payments and, in the spring of 1947, began writing her friendly and solicitous letters. During the interval Mr. Smith prospered, and in his correspondence mentioned particularly the Fire Creek Fuel stock which he had acquired from the plaintiff in the Arkansas settlement for $5,000 and which he was now negotiating to sell at an enormous advance in price.

Whether moved by remorse for the mistreatment of his wife during the first marriage, or by a sense of justice that suggested her moral right to share in the fabulously increased value of the coal stock, or merely by a desire to recapture her affections, the defendant made a series of statements about the bonds in the course of his correspondence with the plaintiff.

In the first of the letters, dated March 17, 1947, he informed her that he was renting a box in the name of his sister, Mrs. McClure, and that he would in the next few days put her bonds in this box, instructing the sister to turn them over to her. The sister, he wrote, would have one of the keys.

Six months later, on September 9, 1947, the defendant wrote the plaintiff listing the numbers of three $5,000 bonds "in your envelope in the lock box I told you about." He also said, "I'll keep adding to them and if I should take any of them out for anything I'll let you know." Two weeks later, on September 22, he wrote her encouragingly of the prospects of selling the mines soon, and added "if the deal goes through there will be some more money due you on the Fire Creek Fuel Company stock, as I will get more than I paid you for your stock, which you can have. If this deal goes through I expect to put, as soon as I can get them, a total of $50,000.00 in bonds in the bank for you. Also, I expect to put the same amount in the bank for Buster." "Buster" is Chester Pryor, the plaintiff's nephew, who was an employee and protege of the defendant.

On January 9, 1948, he announced the consummation of the sale of the coal stock, and declared, "I have put in your package which is sealed up, list of your bonds. They are all issued in blank. (This way no inheritance tax.)" Then follows a list of the numbers of bonds aggregating $50,000, as to a portion of which he notes, "You already had the number on these." The letter also says, " * * * Now if you need any of this money any time I can send you a bond when you need it and you can cash it.

These bonds draw 2½% interest and there will not be any question about you getting them, if something happens to me. I also put the same amount in the same box and told my sister what to do with them for Buster and told her you knew about them. I'll have to draw the interest or part of it from time to time unless I keep a good job. I don't want to spend any of my principal if I can help it."

Apart from the possible legal effect of this letter when coupled with the deposit of the bonds in the box of Mrs. McClure, we have Mrs. Smith's claim of a later manual delivery of the bonds to her in October, 1949. She testified explicitly and in detail to the circumstances. She had been visiting her mother in Pennsylvania when Mr. Smith sent her word by "Buster" to come to Beckley and dispose of her house, which she had rented out. Apparently, Hunter Smith, exercising a degree of control over her property which suggests a friendly relationship between them at the time, had placed Pryor in the house to supervise repairs which Smith had ordered. The plaintiff says that the defendant disclosed to her his plan to leave Beckley, to buy a home in the South where they could live in the wintertime, spending summers in the North. "We will," she quotes him as saying, "get us a Chinese cook, and spend the rest of our lives fishing and hunting."

She also testified that on this visit to Beckley, extending over two weeks, during which he spoke to her often on the phone and in person, Hunter Smith arranged for Buster Pryor to take her in an automobile to a certain parking place near the bank where she had maintained her safe deposit box. According to plaintiff, Pryor left the automobile, and Hunter Smith, who was waiting for the automobile to arrive, entered it; and while seated with him there, she expressed dissatisfaction over the bonds being put in a box kept in Mrs. McClure's name. "I wouldn't trust $50,000.00," she told the defendant, "with my sister, or your sister or anybody's else's sister if he

were gone, if you were dead, especially when there was no name on them." "To this," says the plaintiff, "he replied, 'I don't blame you for that, Net. I'll tell you what I'll do. You have a box in the bank, don't you?'" She testified that he arranged to meet her again and gave her a manila envelope containing the $50,000 bonds, from the numbers of which she noted, and he confirmed, that they included the bonds mentioned in his letter to her. She swore that she put these securities in her own box, while he, declining her invitation to accompany her through the bank lobby, preferred to remain outside. Such had given him one of the keys to the lock box so that he could from time to time add, as his letter had promised, more bonds to those already given her.

According to the plaintiff, the defendant declared how penitent he was for what he had forced her to go through, expressing wonder that she had been able to endure it without losing her mind, and he promised to make up for the wrong he had done her. They spoke of remarriage, although at the time he was still married to the other woman.

They did spend three winters together in Florida and he visited her from time to time in Washington on vacations; and as previously noted, they remarried in September, 1953, shortly after he was divorced from his second wife.

The plaintiff also testified that she had no occasion to go to her safe deposit box or examine its contents from the time she deposited the bonds there in October, 1949, till shortly after the remarriage, when she came across a list of bond numbers in her husband's dresser drawer. Noting that lines had been drawn through certain numbers, she compared the list with her own list of the bonds placed in her lock box. When she sought explanation from her husband of the apparent meaning of her discovery, she learned that he had removed the $50,000 bonds from her safe deposit box, and he refused to return them unless she would agree to a divorce.

The defendant denies calling the plaintiff at her house during her 1949 visit to Beckley, denies making arrangements to meet her uptown, but admits talking to her once in Buster Pryor's automobile when he drove her to the neighborhood of the bank. He says, however, that Pryor was present on that occasion and bonds were not mentioned. He denies seeing or talking with her at any other time in October, 1949, or even knowing there was a telephone in the house. Buster Pryor testified that he had a phone installed to facilitate orders of materials for the repairs. Smith paid for these.

Despite references in the letters to the bonds as "yours," and similar indications that they belonged to the plaintiff, the District Judge concluded that the defendant merely intended to create a testamentary gift, which was revocable at any time. Such is the significance the defendant now attaches to his statement, "There will not be any question about your getting them, if something happens to me."

We do not think that this language does more than point out that if the writer died, the plaintiff would be secure. It did not limit her rights to the contingency of his dying before her. One of the consequences that normally flow from an absolute gift of a large sum of money is that the donee will have the benefit of it if the donor dies. The contemplation of the donee's security in case of the donor's death is not inconsistent with a present gift, and mere reference to this aspect does not limit the operation of the gift to the contingency of death.

Most gifts are not made subject to a reservation of any interest in the donor during his lifetime, and the donee has immediate full enjoyment of the gift; but it is possible for the donor to make a gift of personalty immediately effective, subject, however, to his own life interest.

The defendant also points to the statements in his letters, "If I take out any [of the bonds] I'll let you know," and

"If you need any of this money at any time, I can send you a bond and you can cash it," as indications that he intended to keep possession and dominion of the bonds. But the promise to let her know if he took out any of the bonds, seems to us rather to indicate a recognition that he had created a present interest in her.

His statement seems to be the fulfillment of his written promise, made before the sale of the coal stock, that "If the deal goes through, there will be some more money due you on the Fire Creek Fuel Company stock, as I will get more than I paid you for your stock, which you can have." The promise is not made conditional upon his death or any other happening except the consummation of the sale. Even if before the sale there was only an intent to make a future gift, when the sale was concluded he apparently carried out the intention, and wrote the plaintiff that he had done so. In the letter before sale, he says, "If the deal goes through, I expect to put, as soon as I can get them, the total of $50,000.00 in bonds in the bank for you"; and after the sale he reports to her the accomplished fact—"I have put in your package which is sealed up list of *your* bonds," (emphasis supplied) and he lists the numbers. What may have been at first merely an expression of benevolent intention to be carried out in the future, has with the realization of his great hope been converted into an actual and completed gift.

The letters, the attitude manifested in them by the defendant toward the plaintiff at the time, make the woman's story worthier of belief than the sweeping denials of the defendant. The plausibility of her claim is increased by the fact, given credence by the District Judge, that in her early married life the plaintiff helped her husband accumulate what he had and that the stock he got from her for $5,000 brought him several hundred thousand.

Mr. Smith not only denies the delivery of the bonds claimed by the plaintiff; he denies knowing that she had a safe deposit box. However, his own letter shows that he knew of this box and urged her to transfer her belongings permanently from Washington to her box in Beckley. Her testimony that he retained a key to her box so that he could from time to time add to the bonds in dispute, is consistent with the intention he expressed in an earlier letter. Her story that he used the key instead to abstract the bonds he had given her, is to this extent corroborated, and we find it entirely believable. His complete denial that he even knew of her safe deposit box and the suggestion that he therefore could not have taken anything from it, should not be accepted, for his own letter discredits him. In his effort to prove that he could not have taken the bonds from the plaintiff's safe deposit box, he disclaims too much, and weakens the denial that he took the bonds. Even the language used in his denial raises suspicions. When asked categorically if he had "ever been in" Mrs. Smith's lock box at any time between the divorce and the remarriage, his answer, "Absolutely not," was evasively qualified by the addition of the sentence, "If I was I have no knowledge of it."

His retention of the key to her box is undeniable in these circumstances; and that he had access and did enter it he himself declared in writing. This much there is no room left to doubt. In these circumstances it would be difficult to reject the plaintiff's version of the placing of the bonds in her box and their later disappearance, and to accept the immoderate disavowals of the defendant.

After some dodging, Smith also admitted that before they left for the South in 1952, he wrote the plaintiff that he had put all his bonds in her box, except $30,000, which he took along to buy her a house, which was not bought. He asserted at the trial that what he had written was not the truth, and he seeks on the basis of his own self-serving confession of untruthfulness to disestablish the plaintiff's claim. Incidentally, this letter is not without force to corroborate plaintiff's story of the ardent wooing by the defendant at Beckley in 1949, includ-

ing his painting idyllic visions of a Florida home. This fits more naturally with her version than with his testimony that he saw her not more than once in 1949, and then in Buster's presence.

Unfortunately, the bank's records are incomplete and cannot confirm or contradict the story of either party.

Buster Pryor denied taking the plaintiff to meet the defendant on the occasion when she says Mr. Smith gave her the bonds. The record abounds in evidence that though related to the plaintiff as nephew, Buster is completely dependent upon the defendant. In one of the letters to the plaintiff, the defendant paints Buster as an habitual sponger and waster, who has run through large sums given him by the defendant. The defendant tells of paying Buster's debts and even his garage and dental bills. It is clear from the defendant's letters that Buster is completely responsive to his wishes. He was a witness for Smith, not only in this case but in his earlier unsuccessful suit for divorce from the plaintiff. Moreover, even if we discount these infirmities in Buster as a witness and the possibility of defective memory after the lapse of eight years, his testimony does not directly touch the issue of the delivery of the bonds.

We find the plaintiff's story, aided by the defendant's letters, far more reliable and convincing than the broad denials of the defendant, which are entitled to little weight. Again and again he was compelled to acknowledge that what he had written flatly contradicted him. His last dubious refuge was the assertion that in the letters he was lying, and that the court should accept instead the statements made by him on the witness stand.

The Judge's opinion declares that the defendant lied in many particulars. There are no such infirmities in the plaintiff's testimony. Her version was rejected chiefly because said not to be corroborated. We find abundant corroboration in the circumstances, and in the defendant's own writings. Nevertheless, if the result turned solely on the testimony of the witnesses on the stand, un-

affected by the letters in the record, we should hesitate to substitute our judgment for that of the trial judge. The facts have been recited in detail, not to substitute our impressions of the witnesses for those of the trial judge, but to supply the background against which the letters should be read.

■ The West Virginia law does not stand in the way of plaintiff's recovery. There is ample authority that the retention of the right to interest does not rule out a present gift of the corpus. The defendant's reservation in the letter of gift of the right to enjoy the income during his lifetime is not inconsistent with an absolute present gift of the bonds. Fall River Nat. Bank v. Estes, 1932, 279 Mass. 380, 181 N.E. 242; Matthews v. Hoagland, 1891, 48 N.J.Eq. 455, 21 A. 1054; Packer v. Clemson, 1920, 269 Pa. 1, 112 A. 107; Farmer v. Loyola College, 1934, 166 Md. 455, 171 A. 361; In re Chapple's Estate, 1938, 332 Pa. 168, 2 A. 2d 719; Anno.: "Gift—Reservation of Income," 121 A.L.R. 426; Grissom v. Sternberger, 4 Cir., 1926, 10 F.2d 764, 767.

We attach significance to the statement, "I'll have to draw the interest on part of it from time to time unless I keep a good job. I don't want to spend any of my principal if I can help it." Apparently the alternative to his using the interest on the bonds in dispute, is spending "my principal"; there is no suggestion of his invading the principal of what he calls in the same letter "your bonds." This provides further basis for an inference of a completed gift *inter vivos* with a reservation of the income only.

■ Mr. Smith's written declarations are clear evidence, as required by West Virginia law, of an intent to bestow upon the plaintiff a present interest in the bonds. Waugh v. Richardson, 1929, 107 W.Va. 43, 147 S.E. 17; Taylor v. Spurr, 1944, 126 W.Va. 773, 30 S.E.2d 84, 87; Cf. McKimmie v. Postlethwait, 1916, 78 W.Va. 273, 88 S.E. 833; Banner Window Glass Co. v. Barriat, 1920, 85 W.Va. 750, 102 S.E. 726; Steber v.

Combs, 1939, 121 W.Va. 509, 5 S.E.2d 420; Clark v. Sperry, 1943, 125 W.Va. 718, 255 S.E.2d 870. They merely postpone enjoyment until the defendant's death, reserving in him a life interest in the coupons. This construction appears to be the most reasonable one, and Mr. Smith's retention of possession while calling the bonds "yours" is best explainable in that light. Price v. Moran, 1925, 99 W.Va. 498, 129 S.E. 472; see also: Hudson v. Gleason, 1920, 171 Wis. 238, 177 N.W. 14; Payne v. Tobacco Trading Corp., 1942, 179 Va. 156, 18 S.E.2d 281; Brown, Personal Property (1955), Sec. 48, p. 129 et seq.; 1 Simes and Smith, Future Interests (1956), Sec. 360, p. 388.

In addition to the manifestation of a present donative intent, there is a further requisite, the act of transferring title. The early West Virginia statute provided for gifts by "deed," and under this statute, it was held that "the delivery of the deed constitutes a valid gift to the donees." Spangler v. Vermillion, 1917, 80 W.Va. 75, 92 S.E. 449, 453; Hogue v. Bierne, 1871, 4 W.Va. 658; Price v. Moran, 1925, 99 W.Va. 498, 129 S.E. 472, 473. The gift statute has since been changed, and now provides for gifts of goods or chattels, "by writing, signed by the donor * * *." W.Va.Code, Ch. 36, art. 1, sec. 5, (1955). There are no West Virginia cases construing this statute.

While the authorities elsewhere are not uniform, it has been held, even in the absence of statute, that informal memoranda and letters were sufficient writings to perfect a transfer of a variety of gifts. Ellis v. Secor, 1875, 31 Mich. 185; Hawkins v. Union Trust Co. of New York, 1919, 187 App.Div. 472, 175 N.Y.S. 694; In re Cohn, 1919, 187 App.Div. 392, 176 N.Y.S. 225; Reynolds v. Maust (gift of bonds), 1940, 142 Pa. Super. 109, 15 A.2d 853; In re Harlow's Estate, 1945, 239 Mo.App. 607, 192 S.W. 2d 5; In re Roosevelt's Will, 1947, 190 Misc. 341, 73 N.Y.S.2d 821. Cf. Anno.: "Gift by Written Instrument—Delivery," 48 A.L.R.2d 1405. There is no reason to suppose that the West Virginia legislature, in liberalizing its statute by the substitution of the broad word "writing," sought to attach to that word a narrow definition, and we believe that a restrictive interpretation of the gift statute would not be in keeping with the obvious legislative intent.

Defendant can derive no support from the fact that in September, 1950, he made a will without the plaintiff's knowledge, devising to her, provided she should survive him, one-third of his real estate, and to his sister and Chester Pryor the other two-thirds; and all of his personal property except his bank stock to Pryor, and the bank stock to his sister, Mrs. McClure, with no bequest of personalty to the plaintiff.

It is not perceived how the execution of this will can throw much light on the intention of the defendant in earlier years in respect to the bonds. The argument for the defendant, palpably an afterthought, is that the will's provision for the plaintiff was in substitution for the bonds he had used for himself—the bonds as to some of which, at least, he wrote her in one of the early letters, "I'll keep adding to them, and if I should take any of them out for anything I'll let you know." The value of the devise to her is estimated at $30,000, considerably less than that of the bonds he now says the devise was to replace, and vastly less than she would get if anything approaching the parity of treatment between the plaintiff and Buster, first indicated in defendant's letter of March, 1947, were to be observed. One item alone in the personalty, the proceeds from the sale of the coal stock, is about $300,000.

This disposition of his estate is more consistent with his having previously parted with the contested bonds; and in any event, he could not by will retract anything he had given away.

For these reasons, we think that without the necessity of re-evaluating the witnesses' testimony as to the delivery of the bonds, a completed gift of them,

subject to the life interest, is to be found in the letters.

Reversed with directions to enter judgment for the plaintiff.